Tihomir **MILOSEVIC**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE**, Respondent.

No. 93–1188.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1993.

Decided Feb. 22, 1994.

Ferenc P. Vandor (argued), Chicago, IL, for petitioner.

William J. Howard, David J. Kline, Norah Ascoli Schwarz (argued), Dept. of Justice,

Office of Immigration Litigation, William P. Barr, Office of U.S. Atty. Gen., Washington, DC, A.D. Moyer, I.N.S., James B. Burns, Office of U.S. Atty., Chicago, IL, for respondent.

Before CUMMINGS and COFFEY, Circuit Judges, and ZAGEL, District Judge.*

COFFEY, Circuit Judge.

Tihomir Milosevic ("Milosevic") is a citizen of the former Republic of Yugoslavia who entered the United States on a six-month visitor's visa in June 1985 and never left. He has petitioned this court for review of the Board of Immigration Appeal's ("Board") decision denying him asylum or withholding of deportation under 8 U.S.C. §§ 1158(a) and 1253(h). He also seeks review of (1) the Board's denial of his motion to reopen, and (2) the Board's failure to grant his motion to stay its deportation order. We lack jurisdiction to review the latter two issues, and we affirm the Board's decision denying asylum or withholding of deportation.

## I. Background

Petitioner, who is now approximately 54 years of age, left his native Yugoslavia in 1964 on a Yugoslav passport to seek employment in Austria. He remained in Austria for four years before moving on to West Germany, where he lived and was employed until 1985. While in Germany, Milosevic married a Czechoslovakian citizen, who thereafter sought and was granted asylum and permanent residency in Germany. The marriage produced a son who later became a West German citizen upon reaching the age of 17.

Milosevic left his wife and child and came alone to the United States in 1985. While in America, the petitioner Milosevic married a United States citizen who filed a visa petition on his behalf in 1986. This marriage ended four months later, and at this time Milosevic's second ex-wife withdrew the petition. Shortly thereafter, the INS issued an Order to Show Cause why Milosevic should not be deported as an alien who had overstayed his visa (six months). At his deportation hearing, Milosevic conceded deportability but requested asylum and withholding of deportation under 8 U.S.C. §§ 1158(a) and 1253(h).

In his application for asylum, the petitioner recited that prior to his arrival (1985) in the United States it was his practice to visit Yugoslavia about twice a year, and that during these visits he was detained and interrogated "numerous times" by the Yugoslav Secret Police regarding his activities in West Germany. He further claimed that on three of these visits (in 1982, 1983, and 1985) the Secret Police detained him for approximately 48 hours, and that on each occasion he was "threatened with physical punishment and torture." He also alleged that at some unspecified time his wife and child in West Germany had been threatened as well as his parents and sister in Yugoslavia. He claimed that during his last trip to Yugoslavia in 1985 the Secret Police warned him not to return again. Since then, he stated, his former wife in Germany has been "warned about [his] return to Yugoslavia," and has also been questioned about his activities "several times."

In two separate places in his application form, Milosevic noted that he had "written" a book critical of the communist regime and that this book would result in his imprisonment if he should ever return to Yugoslavia. Elsewhere on his application he alleged that the Yugoslav government believed he was spying for the West Germans, and that if he were deported to Yugoslavia he would be "killed" (presumably by the Secret Police). In support of this claimed fear he attached a news story about an anti-communist Croatian talk-show host who was killed by unknown assailants in Chicago. In response to a question posed on his asylum application form, the petitioner explained that his failure to seek asylum in Germany at any time during his 15-year residence there was due to the fact that "the UDB (Yugoslav Secret Police) and the BND (W. Germany Secret Police) were collaborating at that time and numer-

---

* The Honorable James B. Zagel, District Judge for the Northern District of Illinois, is sitting by designation.

ous Yugoslav dissidents were killed in Germany by the Yugoslav Secret Police."

The Office of the Immigration Judge forwarded a copy of petitioner's completed asylum application to the State Department's Bureau of Human Rights and Humanitarian Affairs ("Bureau") for their comments.[1] After reviewing Milosevic's application, the director of the Bureau's Office of Asylum Affairs advised the Immigration Judge ("IJ") that in the Bureau's opinion the petitioner had not established either past persecution or a well-founded fear of future persecution.

Milosevic was then accorded a two-day asylum hearing at which he testified at length regarding his fear of being persecuted by Yugoslavian authorities. He testified that he had come to America to write and publish a book on Euro-communism and that so far he had completed 17 pages of the book he previously had claimed to have "written." He informed the IJ that he had not yet approached any publishers about this book, but that he believed it would be easier to publish the book in America than in Europe. He also explained that although this book would be his first literary effort and would be written in the Serbo–Croatian language, he expected it to be translated into several languages and cause him to be viewed as an enemy by the Yugoslav regime.

Petitioner further testified that on the occasion of two of his visits to Yugoslavia (in 1977 and 1978) he had been detained by the Yugoslav police and asked to inform on the activities of his Yugoslav co-workers in Germany. In spite of the fact that in each instance he refused to provide any information, the authorities released him after 48 hours. He also reported that even though the police threatened on occasion to confiscate his passport and prevent his reuniting with his family in Germany, he continued to visit Yugoslavia about twice a year for seven more years after his last alleged detention. He further claimed that his ex-wife in Germany had warned him that, shortly after he departed for America, persons from the Yugoslav Consulate visited their house to inquire as to his whereabouts. Milosevic later testified that this visit had actually involved a

search of his German home, and that a cousin had advised him that the police had searched his parents' home in Yugoslavia as well.

Finally, the petitioner testified that since being struck by a car in January 1987 he had begun to exhibit symptoms that may indicate Parkinson's disease.

The IJ denied Milosevic's application for asylum and/or withholding of deportation. In his oral opinion, the IJ ruled that petitioner had failed to establish either past persecution or a well-founded fear that he would be persecuted in the future if he were returned to Yugoslavia. The IJ noted that Milosevic "relies solely upon his conduct of writing a book for his fears to return back to his native country," and that one could only speculate whether this book would ever be completed, let alone published and noticed by government authorities. The IJ also observed that the petitioner's claimed fear of the Yugoslav Secret Police was undermined by the fact that he had traveled freely to and from Yugoslavia for some 20 years (between 1965, shortly after he first left his native land, until 1985, when he arrived in the United States), by his failure to apply for refugee status in Germany or any other country besides the United States, by his failure to apply for asylum in the United States until after the Order to Show Cause had been issued (more than a year after his arrival in 1985), and by his failure to establish that he could not return to Germany, where he had lived for 15 years and where his former wife and only child both reside.

Milosevic appealed to the Board, contending that the IJ had failed to apply the proper standards of proof in denying his application for asylum and withholding of deportation. On review, however, the Board found that the IJ had correctly explained that to be eligible for withholding of deportation under 8 U.S.C. § 1253(h), the applicant must establish that there is a "clear probability" that he or she will be persecuted as the result of being deported. The Board further found that the IJ did not err in ruling that to be eligible for asylum, an alien must demonstrate that he or she is a "refugee" within the

---

**1.** Authority for this procedure is found in 8    C.F.R. § 236.3(b).

meaning of 8 U.S.C. § 1101(a)(42)(A), and that Milosevic therefore was required to demonstrate that he either had been persecuted in the past or that he had a "well-founded fear" of being persecuted in the future.

The Board also agreed with the IJ that Milosevic's fear of being persecuted upon the publication of his as-yet unwritten book was "nothing more than speculation." It further found that the petitioner's claims of having been verbally threatened by the Secret Police were undermined by the fact that despite these alleged threats he had continued to visit his country regularly on a passport which the Yugoslav government had continued to renew and reissue.

Milosevic filed a motion to reopen the proceedings, which was denied. He subsequently filed a motion to reconsider that denial, as well as a motion to stay deportation pending resolution of his motion to reconsider. Neither of these last two motions had been decided at the time of oral argument before this court.

## II. Issues

Petitioner argues that the Board erred in upholding the IJ's decision to deny him asylum or withholding of deportation. Milosevic further contends that the Board also abused its discretion in denying his motion to reopen the proceedings and in failing to decide his motion to stay deportation.

## III. Discussion

### A. Asylum

The Attorney General has discretion to grant asylum to "refugees." 8 U.S.C. § 1158(a). A refugee is defined by statute as one who is unable or unwilling to return to his or her country "because of [past] persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

" 'Persecution' is not defined in the Act, but we have described it as 'punishment' or 'the infliction of harm' for political, religious, or other reasons that are offensive. [Citing *Osaghae v. INS*, 942 F.2d 1160,

1163 (7th Cir.1991); *Balazoski v. INS*, 932 F.2d 638, 642 (7th Cir.1991) (definition of persecution includes at minimum conduct that threatens 'life or freedom'); *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir.1990) (same) ]."

*Sivaainkaran v. INS*, 972 F.2d 161, 163 (7th Cir.1992).

■ To prove his well-founded fear of persecution, an alien must not only show that his fear is genuine, but that it is a *reasonable* fear. *Sivaainkaran v. INS*, 972 F.2d 161, 164 n. 2 (7th Cir.1992). "Although the Supreme Court has declined to define 'well-founded fear,' this court has consistently held that in order to demonstrate a well-founded fear, a petitioner must present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution." *Zulbeari v. INS*, 963 F.2d 999, 1000 (7th Cir.1992) (citing *Balazoski v. INS*, 932 F.2d 638, 641 (7th Cir.1991); *Carvajal–Munoz v. INS*, 743 F.2d 562, 573 (7th Cir.1984)).

■ Ultimately, an applicant bears the burden of proving both that he or she is statutorily eligible for asylum by virtue of being a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42), and that the attorney general should proceed to exercise her discretion to grant asylum. *Sivaainkaran* at *id.*

In this case the Board has determined that Milosevic is ineligible for asylum, ruling that he failed to establish either past persecution or a well-founded fear of persecution as required by 8 U.S.C. § 1158(a).

■ We review the Board's determination that an alien is ineligible for asylum under the "substantial evidence" test. Under this "highly deferential standard of review," we will uphold the Board's determination "if it is 'supported by reasonable, substantial, and probative evidence on the record as a whole,' 8 U.S.C. § 1105a(a)(4), and may reverse only if the evidence is so 'compelling that no reasonable factfinder could fail to find the requisite fear of persecution.' " *Sivaainkaran*, 972 F.2d at 163 (quoting *INS v. Elias–Zacarias*, ―― U.S. ――, ――, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992)). Thus,

a reviewing court is not entitled to reverse "simply because it is convinced that it would have decided the case differently." *Klawitter v. INS,* 970 F.2d 149, 151–52 (6th Cir. 1992) (citations omitted). Rather, the Board's decision can be reversed "only if the evidence presented by [the petitioner] was such that a reasonable factfinder would *have* to conclude that the requisite fear of persecution existed." *INS v. Elias–Zacarias,* —— U.S. ——, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992) (emphasis added) (citing *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)).

■ We begin our review by noting that the record confirms the Board's observation that the bulk of petitioner's fear of persecution stems from his concern about what might happen to him after his projected book on Euro-communism is read by communist authorities in Yugoslavia. We agree with the Board that these fears involve "mere speculation."

Initially, one can only speculate as to whether petitioner will actually complete this book and submit it for publication. Certainly the petitioner's credibility in this regard leaves much to be desired, for although in his application for asylum he twice claims to have already written this book, at his subsequent asylum hearing he testified that he had written only 17 pages. We also note that he has never written, let alone published, a book-length manuscript before, and that although he testified in 1986 that he expected to finish writing this book within a year and a half, it was disclosed at oral argument that, six years later, the book remains uncompleted.

There also is nothing but speculation to suggest that if Milosevic does complete the manuscript, it will be accepted for publication. The petitioner testified that even though he was writing this political treatise in the Serbo–Croatian language, he had not to date contacted any American publishers to gauge their interest in translating and publishing such a work. Finally, even if his 17-page manuscript should grow into a published book, there is nothing but conjecture to support Milosevic's fear that the current authorities in the former Republic of Yugoslavia will not only read it, but also take action against him because of it.

The record confirms the Board's conclusion that petitioner's other evidence regarding either past or possible future persecution is equally unconvincing and speculative. In his asylum application, for example, Milosevic stated that the Yugoslav Secret Police had in some unspecified manner "threatened" both his parents in Yugoslavia and his ex-wife in Germany. At his asylum hearing, however, the petitioner did not mention any such threats. Instead, he testified that he had been told that unknown persons from the Yugoslav Consulate had visited his home in Germany and "only asked [his ex-wife] where is your husband." He later described this same visit as a "search" of his German home by the Secret Police and went on to testify for the first time that his Yugoslav home had been searched as well.

Similarly, whereas the petitioner Milosevic stated in his asylum application that the "Yugoslav government believes I was spying for the West Germans," he abandoned that claim at his hearing and testified instead that the Yugoslavs were trying to force him to spy for them.

Milosevic's statements regarding his alleged detentions by the Yugoslav police during his annual home visits are also inconsistent. In his application for asylum, the petitioner initially claimed that he had been detained for 48 hours and threatened with torture on three occasions—once in 1982, once in 1983, and once in 1985. But later, at his asylum hearing, he testified that he had been detained for 48 hours and threatened, not on three occasions, but on two occasions, and not in 1982, 1983 or 1985 as he had stated in his application, but in 1977 and 1978.[2]

The record also provides substantial evidence to support the IJ's conclusion that the petitioner's conduct fails to corroborate his

---

**2.** In any event, "brief detentions and mild harassment" by a previous government "do not add up to 'persecution'" within the meaning of 8 U.S.C. § 1101(a)(42). *Skalak v. INS,* 944 F.2d 364, 365 (7th Cir.1991).

claimed fears of persecution. We are struck, as both the Board and IJ were, by the fact that not only did Milosevic never apply for asylum in Germany (where he lived for 15 years and had a family), but he never even applied for asylum in the United States until after his second wife withdrew her visa application on his behalf and deportation proceedings were begun.

The evidence in the record thus falls far short of the "specific, detailed" facts that would "compel" us to reverse the Board's determination that the petitioner has failed to demonstrate either past persecution or a well-founded fear of future persecution. *See Sivaainkaran v. INS*, 972 F.2d at 163 (7th Cir.1992). We therefore hold that the Board's denial of Milosevic's petition for asylum is supported by substantial evidence.

### B. Withholding of Deportation

■ For the petitioner to be entitled to withholding of deportation to some other country, the alien must establish that his "life or freedom *would be threatened* in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1) (emphasis added). This language in the statute has been delineated by the Supreme Court as requiring the petitioner requesting withholding of deportation "to establish by objective evidence that it is *more likely than not* that he or she will be subject to persecution upon deportation." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 430, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987) (emphasis added). Further, petitioners for withholding of deportation also are required to establish that they face a "clear probability" of persecution in the future. *INS v. Stevic*, 467 U.S. 407, 413, 104 S.Ct. 2489, 2492, 81 L.Ed.2d 321 (1984).

■ Relying on *Cardoza–Fonseca*, it follows that an alien seeking withholding of deportation pursuant to 8 U.S.C. § 1253(h) bears a heavier burden of proof than does an asylum applicant proceeding under the "well-founded fear" standard of 8 U.S.C. § 1158(a), for "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking

place." *Cardoza–Fonseca*, 480 U.S. at 431, 107 S.Ct. at 1212.

■ In this case the Board has ruled that since the petitioner's evidence was insufficient (for the reasons stated in section III(A) of this opinion) to meet the "well-founded fear" standard required of asylum applicants under 8 U.S.C. § 1158(a), this same evidence was necessarily inadequate to establish the higher, "clear probability of persecution" standard that applicants must meet in order to merit withholding of deportation under 8 U.S.C. § 1253(h).

We agree with this reasoning and hold that the same substantial evidence that supports the Board's finding that Milosevic is ineligible for asylum is more than sufficient to support the Board's finding that he is ineligible for withholding of deportation.

### C. Motion to Reopen

■ In his brief, Milosevic for the first time asks us to review the Board's denial of his motion to reopen the proceedings pursuant to 8 C.F.R. § 3.2. The Immigration and Nationality Act, however, clearly provides that petitions for review must be filed no later than 90 days after the issuance of any final order of the Board. 8 U.S.C. § 1105a(a). At oral argument, counsel conceded that he had never filed a petition with this court for review of the Board's decision denying his motion to reopen. Because Milosevic failed to file a petition for review of this decision within 90 days, and in fact never filed one at all, we lack jurisdiction to review the decision. "It is really tautological to hold that a party, in order to seek review of any final order, must file a petition for review of that order." *Akrap v. INS*, 966 F.2d 267, 271 (7th Cir.1992).

### D. Motion to Stay Deportation

■ Milosevic also contends that the Board abused its discretion when refusing to grant his pending Request for an Emergency Stay of Deportation. He argues that unless the Board grants this stay, he may be deported before the Board has had an opportunity to decide his motion for reconsideration of its denial of his motion to reopen. This

may be so, but it does not alter the fact that as a court of appeal we lack jurisdiction to review stays of deportation. As we have explained before:

"Because the denial of a stay is not a final order of deportation under 8 U.S.C. § 1105a(a) [Section 106(a)] (*Bothyo v. INS*, 783 F.2d 74, 75 (7th Cir.1986); *Diaz–Salazar v. INS*, 700 F.2d 1156, 1159 (7th Cir.1983); *Cheng Fan Kwok v. INS*, 392 U.S. 206, 212, 88 S.Ct. 1970, 1974, 20 L.Ed.2d 1037 (1968)), there is no jurisdiction in a Court of Appeals to review such a denial. Any review of decisions regarding stays of deportation falls instead within the district courts' habeas corpus jurisdiction as now established in Section 106(a)(10), 8 U.S.C. § 1105a(a)(10) (*Bal v. Moyer*, 883 F.2d 45, 46–47 (7th Cir.1989) (per curiam); *Bothyo v. Moyer*, 772 F.2d 353, 355 (7th Cir.1985))."

*Akrap v. INS*, 966 F.2d at 270 (internal quotations omitted).

Nevertheless, we will observe that we do not think the petitioner helps his "abuse of discretion" argument by invoking due process principles regarding the right to be heard. We point out that Milosevic has exercised his right to be heard so well and so often that nearly eight years have now elapsed since the Board first sought to deport him for overstaying his visitor's visa. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citations omitted). The record discloses that the petitioner in this case has in fact been accorded several meaningful opportunities to be heard: he has obtained a hearing before an Immigration Judge, two reviews by the Board (once on direct appeal and once again on his petition to reopen) and now of course yet another careful review in this court.

### E. Changed Circumstances

█ Finally, Milosevic recounts several changes that have taken place in the nearly six years since his asylum hearing. In his brief he has included a letter from a physician dated March 12, 1993, indicating that his examination of the petitioner uncovered "typical physical findings of Parkinson's disease" warranting close medical supervision and additional testing.

The petitioner Milosevic has not offered any legal theory, however, that would explain the relevance of this 1993 letter to his appeal from the Board's 1992 denial of his claim for asylum or withholding of deportation—the only Board decision that we have jurisdiction to review. Although we might agree with the petitioner that the medical care available in the United States is superior to that available in any other country, we are of the opinion that we lack jurisdiction to review this issue. It is well-established that we "will not weigh evidence that the Board has not previously considered," *Rhoa–Zamora v. INS*, 971 F.2d 26, 34 (7th Cir.1992).

█ The petitioner also asks us to take judicial notice of the fact that the former Republic of Yugoslavia "is now in complete chaos." Initially, we note that these changed circumstances were not before the Board when it issued its 1992 decision denying asylum and withholding of deportation—which, again, is the only decision over which we have jurisdiction to review.

Moreover, the petitioner has failed to offer any legal theory by which the general conditions in some portions of his native land can support his claim of a well-founded fear that he will be "singled out" for persecution. If anything, the collapse of the communist government in the former Republic of Yugoslavia would suggest that Milosevic's still unpublished anti-communist views are likely to be of *less* rather than more interest to the present authorities there.

In another case involving an asylum applicant from a country which, like the former Republic of Yugoslavia, was "locked in a seemingly intractable ethnic civil war," we observed that "conditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum." *Sivaainkaran*, 972 F.2d at 165. We explained that the requirement that an asylum applicant demonstrate that he or she has a reasonable fear of being *singled out* for persecution

"is no doubt driven by Congress' concern that a more lenient and compassionate pol-

icy would qualify the entire population of many war-torn nations for asylum. *See, e.g., Arriaga–Barrientos v. INS,* 925 F.2d 1177, 1180 (9th Cir.1991) (current immigration policy not designed to open our borders to all who seek to avoid dangerous and unpleasant conditions)."

*Sivaainkaran,* at *Id.*

Nevertheless, we did inquire at oral argument regarding the conditions in Milosevic's home state of Sarkaman, and counsel for the government advised that Sarkaman, where the petitioner still has family, is located near the border of Romania and well removed from the troubles of Bosnia–Hercegovina, the one region in the former Republic of Yugoslavia whose nationals are eligible (by order of the Attorney General[3]) for temporary haven in the United States under 8 U.S.C. § 1254a(b)(1).

### IV.   Conclusion

The decision of the Board of Immigration Appeals denying asylum and/or withholding of deportation is supported by substantial evidence.   We lack jurisdiction to reach the other issues.

AFFIRMED.

---

**3.** The Attorney General's order naming Bosnia–Hercegovina a state whose nationals are eligible for Temporary Protected Status can be found at 57 Fed.Reg. 35604–35605 (Aug. 10, 1992).