Jenica BORCA, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 95–2206.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1995.

Decided Feb. 29, 1996.

Y. Judd Azulay, Stephen D. Berman (argued), Azulay & Azulay, Chicago, IL, for Petitioner.

Janet Reno, Office of the United States Attorney General, Washington, DC, Samuel Der-Yeghiayan, I.N.S., Chicago, IL, James B. Burns, Office of the United States Attorney, Chicago, IL, William J. Howard, David M. McConnell, Marion E. Guyton, Theresa Wallbam (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before CUMMINGS, WOOD, Jr., and EASTERBROOK, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Jenica Borca, a citizen of Romania, appeals the decision of the Board of Immigration Appeals ("BIA") which affirmed the Immigration Judge's finding of deportability. Borca, who legally entered the United States with a visitor's visa, had filed an administrative application for asylum and withholding of deportation. The BIA rejected Borca's peti-

tion after concluding that Borca had failed to establish either past persecution or a well-founded fear of persecution. For the reasons given below, we affirm in part and reverse and remand in part.

## I. BACKGROUND

Borca legally entered the United States on December 6, 1991, with a visitor's visa which was valid until June 6, 1992. On April 27, 1993, the Immigration and Naturalization Service ("INS") initiated deportation proceedings against Borca in light of her failure to leave the United States after the expiration of her visa. Prior to the expiration of her visa, Borca had filed an administrative application for asylum and withholding of deportation in which she claimed that she would likely be persecuted for her political opinion if she returned to Romania. A hearing was held before an Immigration Judge on January 4, 1994, during which Borca conceded her deportability. A second hearing was scheduled for May 27, 1994, to address the merits of Borca's application. In the interim, Borca filed a second, more detailed application for asylum and withholding of deportation.

At the May 27th hearing, Borca presented the following testimony, which the Immigration Judge found to be credible and uncontradicted: Borca claims that her troubles began when an uncle sought her aid in locating his two adult children, who were last seen on December 16, 1989. The request was made on December 25, 1989, in the midst of the upheaval surrounding the end of Romania's totalitarian era. Borca's uncle enlisted her aid because she worked as a radiologist at the municipal hospital in Timisoara, and it was possible that her cousins were among the many victims of the uprising being treated there.[1]

---

1. This case is complicated by the fact that it stretches across the reigns of three governments. The pertinent facts commenced under the rule of the dictator Nicolae Ceausescu: On December 17, 1989, a large protest was held in Timisoara to block the forced transfer of a popular minister. E.g., Clyde Haberman, *Rumania's Years of Desperation, Days of Relief,* N.Y. Times, Dec. 31, 1989, § 4, at 3. Ceausescu's security forces fired into the crowd, killing scores and setting off a chain of events that ended in the overthrow and execution of Ceausescu on December 25, 1989. *Id.*

A transitional government immediately assumed control and it was under this government that Borca's alleged difficulties, discussed *infra,* first began. Although popular elections were held several months after Ceausescu was deposed, the political party since formed by the transitional government remains "the dominant force in Romanian politics." Virginia Marsh,

When Borca checked the hospital's main registration records for evidence of her uncle's children, she discovered that all of the records for the relevant dates—December 16–18, 1989—had been removed. Borca then checked the registration records of the radiology department, which was apparently serving as a backup emergency room at the time. The registration records of the radiology department for the dates in question had also been removed. Borca then searched the files of the hospital's x-ray library and here she was more successful. The hospital retained all patients' x-ray files for a period of six months and the files of the patients admitted on these dates were still intact. By this time, Borca was convinced that she had unearthed an effort by officials of the hospital to obscure the fate of certain individuals injured or killed during the overthrow of the Ceausescu regime. According to Borca, many individuals in the Timisoara area suffered the same mysterious fate as Borca's uncle's children.

Consequently, Borca retrieved all of the files for one day—December 17, 1989—that involved firearm wounds.[2] Borca photocopied a portion of each of the resulting thirty-three files and hid the copies at an aunt's house. Borca did not, however, attempt to conceal her photocopying activities and her involvement in the matter became generally known. Moreover, Borca discussed the issue of the missing records with her colleagues and several of them agreed to help her systematically search the hospital's library. This comprehensive search allegedly revealed further evidence that a purge of the hospital's records had taken place.

Borca claims that she also attempted to meet with the hospital's director, but that the director told her to mind her own business. The director was replaced shortly thereafter with a new appointee. Since Borca did not feel that she could trust the new director—his name, as the treating physician, allegedly appeared on some of the files she had copied—she provided an account of the incident to the local newspaper. Borca informed the newspaper of her theory that the missing records evidenced the efforts of Romania's transitional government to cover-up the tumultuous beginnings of its rule. The newspaper did not, however, publish Borca's story.

Shortly after Borca went to the newspaper, she was subjected to a lengthy interrogation by the Romanian secret police during which time she was asked about the photocopies she had made. Borca claims that she lied to her interrogators by telling them that she had removed the copied files from the country. Afterwards, Borca discovered that her room had been searched. Borca then began to receive threatening calls at the hospital, in which the anonymous callers demanded that she destroy the photocopies. Borca requested, and was granted, a transfer to another hospital in a nearby town, Otelul Rosu. A month or two after her transfer, Borca was subjected to another interrogation and her dwelling was searched again.

Thereafter, Borca did not experience any serious trouble until November, 1991, when she helped to organize a demonstration against the health minister and the Romanian government. Borca prepared posters for the demonstration. She also gave a speech in which she addressed the issue of the missing records. When Borca returned to work after the demonstration, she was informed by the hospital director that her employment was being terminated due to her oppositional activities. In addition, Borca was told that she was barred from assuming any other form of government employment, except perhaps for a farm laborer position.

Borca's mother later informed her that the secret police had been looking for her again. Borca went into hiding and then left Romania for the United States, accompanied by her mother, a short while later. Borca states that she has telephoned some of her old

---

*Survey of Romania*, Fin. Times, May 25, 1995, at 35. For example, the president of the transitional government, Ion Iliescu, is currently serving his second elected term as president. *Id.*

2. The record does not reveal why Borca limited her efforts to this single day, nor does the record reveal why she only gathered files involving firearm wounds. The record is also silent regarding whether Borca located any information pertaining to her cousins.

neighbors since her arrival in the United States and that they reported that the Romanian secret police are still asking about her.

The Immigration Judge denied asylum after concluding that, although the events Borca complained of did constitute harassment and intimidation, Borca had failed to establish that she had been persecuted or that she possessed a well-founded fear of persecution. The Immigration Judge further concluded that Borca had necessarily failed to meet the stricter standard required to secure withholding of deportation. Borca then appealed to the BIA. The BIA adopted the reasoning and decision of the Immigration Judge and this appeal followed.

## II. STANDARD OF REVIEW

■ Our review of the BIA's interpretation of the Immigration Act is *de novo*. *Zalega v. INS*, 916 F.2d 1257, 1259 (7th Cir. 1990) (citations omitted). We will, however, defer to the BIA's interpretation of the Act if the intent of Congress with respect to the matter at issue is not clear and if the interpretation offered by the BIA is reasonable. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). We review the BIA's factual findings that Borca failed to establish past persecution or a well-founded fear of future persecution under the "substantial evidence" standard. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992); *Milosevic v. INS*, 18 F.3d 366, 370 (7th Cir.1994). Under this standard, we must uphold the BIA's findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). We may only arrive at a factual conclusion different from that reached by the BIA if "the evidence not only *supports* that conclusion, but *compels* it." *Elias–Zacarias*, 502 U.S. at 481 n. 1, 112 S.Ct. at 815 n. 1.

## III. DISCUSSION

We note first that Borca has applied both for asylum under § 208(a) of the Immigration Act, 8 U.S.C. § 1158(a), and withholding of deportation under § 243(h) of the Immi-gration Act, 8 U.S.C. § 1253(h). The standards facing a petitioner are different in these two contexts. Accordingly, we must examine each in turn.

### A. *Asylum*

Section 208(a) authorizes the Attorney General to grant asylum to an applicant who qualifies as a "refugee" under 8 U.S.C. § 1101(a)(42)(A). The definition of a refugee provided by that section requires Borca to show that she is unwilling to return to Romania "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

[5–7] In order to demonstrate a well-founded fear of persecution, "an alien must not only show that h[er] fear is genuine, but that it is a *reasonable* fear." *Milosevic*, 18 F.3d at 370 (citation omitted). The reasonableness component of this equation requires a petitioner to establish "that a reasonable person in the asylum applicant's circumstances would fear persecution if she were returned to her native country." *Balazoski v. INS*, 932 F.2d 638, 640 (7th Cir.1991) (citations omitted). Towards this end, " 'a petitioner must present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution.' " *Milosevic*, 18 F.3d at 370 (quoting *Zulbeari v. INS*, 963 F.2d 999, 1000 (7th Cir.1992) (citation omitted)).

■ The Immigration Act does not, however, provide a statutory definition for the term "persecution." We have defined persecution as "punishment" or "the infliction of harm" which is administered on account of one of the five grounds—race, religion, nationality, group membership, or political opinion—specified in § 1101(a)(42)(A). *E.g.*, *Milosevic*, 18 F.3d at 370 (citations omitted). Although the conduct in question need not necessarily threaten the petitioner's "life or freedom," it must rise above the level of mere "harassment" to constitute persecution. *Balazoski*, 932 F.2d at 642 (citations omitted).

## (1) *Borca's Claim of Past Persecution*

■ As an initial matter, we uphold the conclusion of the BIA that Borca has failed to establish past persecution. Substantial evidence supports the BIA's finding that the events delineated by Borca—namely being interrogated twice, having her dwelling searched twice, and receiving threatening phone calls—are not sufficiently serious to rise beyond the level of harassment.

## (2) *Borca's Claim of a Well-founded Fear of Persecution*

■ Turning to Borca's claim of a well-founded fear of persecution, we note that the future persecution which Borca claims to fear is primarily of an economic nature. Borca was fired from her job as a radiologist and allegedly barred from assuming any other government employment, except for possibly a position as a farm laborer. The Immigration Judge held, and the BIA agreed, that economic persecution may only confer refugee status under 8 U.S.C. § 1101(a)(42)(A) if "the persecution is so severe as to deprive an applicant of all means of earning their living." Since Borca would admittedly be allowed a limited opportunity to work, the Immigration Judge found that this stringent test had not been met.

In support of this ruling, the Immigration Judge cited *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir.1990), and the cases cited therein. While it is true that we found the economic difficulties suffered by the petitioner in *Zalega* to be insufficient to constitute persecution, we nowhere provided a test as exacting as that applied by the Immigration Judge in this case. In fact, this total deprivation of livelihood standard squarely contradicts our earlier rulings that a threat to life or freedom is *not* necessarily a persecution prerequisite. *E.g., Balazoski*, 932 F.2d at 642.

Moreover, one case cited by *Zalega, Kovac v. INS*, 407 F.2d 102, 105–07 (9th Cir.1969)—a case which the Immigration Judge also cited approvingly—expressly rejects the stringent test employed by the Immigration Judge. While it is true that *Kovac* addressed a petitioner's application for withholding of deportation under § 243(h), its interpretation of the term "persecution" should apply with equal force when that term is used in the asylum context.[3]

The *Kovac* opinion came on the heels of the 1965 Amendment to the Immigration Act. In pertinent part, the amendment had deleted the adjective "physical" from § 243(h)'s former requirement of a showing of "physical persecution."[4] Discussing the impact of this alteration, the *Kovac* court stated:

[B]y deleting the word "physical," Congress intended to effect a significant, broadening change in section 243(h) which would lighten the burden imposed on applicants for asylum by removing the requirement that they show threatened bodily harm. This intent seems especially relevant in cases of alleged economic persecution. The burden of showing a probable denial of *all* means of earning a livelihood arose from the necessity of showing bodily harm. . . .

The amendment thus eliminated the premise upon which courts construing the old statute—and the Board in this case—based the rule that, to come within the reach of section 243(h), a denial of employment opportunities must extend to all means of gaining a livelihood. . . .

. . . .

Under the amended statute, therefore, a probability of deliberate imposition of substantial economic disadvantage upon an alien for reasons of race, religion, or political opinion is sufficient to confer upon the

---

**3.** Despite the different burdens of proof which petitioners ultimately face in these two settings, a term common to both settings should be interpreted consistently, unless Congress has indicated otherwise.

**4.** The 1980 Amendment to the Immigration Act further altered § 243(h) by replacing the term "persecution" with the threat to life or freedom language currently found at 8 U.S.C. § 1253(h)(1). This same amendment incorporated the term "persecution" into the asylum context for the first time.

Attorney General the discretion to withhold deportation.

*Kovac*, 407 F.2d at 106–07.

The other cases cited in *Zalega* also fail to lend support to the ruling below. In *Desir v. Ilchert*, 840 F.2d 723, 727 (9th Cir.1988), for example, it is true that the severe impairment of petitioner's livelihood was directly caused by the threats and actual attempts on his life, but the *Desir* court nowhere indicated that this scenario delineated the minimum showing needed to demonstrate economic persecution.

Likewise, in *Youssefinia v. INS*, 784 F.2d 1254, 1261 (5th Cir.1986), the court stated that "economic detriment due to a change in political fortune is alone insufficient to establish a well-founded fear˙ of persecution." This assertion, however, is not inconsistent with the test developed by *Kovac*. *Kovac*, for example, requires "*substantial* economic disadvantage." *Kovac*, 407 F.2d at 107 (emphasis added). More importantly, the economic harm required under *Kovac* must be "deliberate[ly] impos[ed]" as a form of punishment. *Id.* This is to be distinguished from the natural, nonpunitive economic downturns which are commonly experienced by members of a former ruling party upon their disenfranchisement, as was the case in *Youssefinia.* In fact, it was the presence of these moderating factors which forced the petitioner in *Youssefinia* to argue that "a total withdrawal of all economic opportunity" would be sufficient to establish a well-founded fear of persecution. *Youssefinia*, 784 F.2d at 1261 (emphasis removed). The *Youssefinia* court, in response, did not ex- pressly agree that such an utter lack of economic opportunity must necessarily be shown; the court simply stated that the petitioner had failed to make any such showing.[5] Even if *Youssefinia* is read to require a total withdrawal of economic opportunity, however, the case appears to be limited to those situations where economic opportunity is not deliberately and punitively withheld.[6]

 Our review of this matter convinces us that the *Kovac* court was correct in concluding that the 1965 Amendment was intended to lessen the burden imposed upon petitioners. The total deprivation of livelihood standard employed by the Immigration Judge, and adopted by the BIA in this case, is more in keeping with the harsher case law developed prior to the 1965 Amendment. Therefore, we conclude that the BIA has acted unreasonably.

No one has suggested a plausible alternative to *Kovac*'s economic persecution standard. Moreover, the BIA itself has cited *Kovac* with apparent approval—in the decision of the Immigration Judge below which the BIA adopted and in prior decisions. *See Matter of Acosta*, 19 I. & N. Dec. 211, 222 (1985). We therefore follow the approach of *Kovac* today. To establish a well-founded fear of economic persecution, Borca must show that she faces a probability of deliberate imposition of substantial economic disadvantage on account of her political opinion.[7] The BIA, of course, retains its discretion to adopt a different approach, so long as that approach is consistent with the statute. *See,*

---

5. We note that the Immigration Judge misstated both the facts and holding of *Youssefinia* when he stated: "In *Youssefinia* ... there was total withdrawal of economic opportunity, and it was held that this loss of economic opportunity was .sufficient to support a finding of a well-founded fear of persecution." As discussed above, the exact opposite was true: The petitioner failed to show that he faced a total withdrawal of economic opportunity and this failure contributed to the court's conclusion that the petitioner had failed to demonstrate a well-founded fear of persecution.

6. The remaining cases cited in *Zalega* similarly fail to provide support for the Immigration Judge's legal interpretation. *See Minwalla v.*

*INS*, 706 F.2d 831, 835 (8th Cir.1983) (mere economic detriment not sufficient); *Berdo v. INS*, 432 F.2d 824, 847 (6th Cir.1970) (citing *Kovac*'s "deliberate imposition of substantial economic disadvantage" test); *Cheng Kai Fu v. INS*, 386 F.2d 750, 753 (2d Cir.1967) (generally shared economic difficulties not sufficient), *cert. denied*, 390 U.S. 1003, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968).

7. This standard is equally applicable to a well-founded fear of persecution on account of any of the other grounds delineated by 8 U.S.C. § 1101(a)(42)(A)—race, religion, nationality, or membership in a particular social group. Borca, however, claims that the persecution she fears is solely attributable to her political opinion.

*e.g., INS v. Jong Ha Wang,* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981).

By requiring Borca to show a deprivation of all means of earning a livelihood, the BIA failed to heed Congress's intent, as expressed in the 1965 Amendment, to lessen the burden needed to show persecution. Accordingly, we reverse the BIA's conclusion that Borca has failed to meet the definition of a "refugee" under 8 U.S.C. § 1101(a)(42)(A) and we remand this part for further proceedings in conformity with this opinion. We anticipate that the BIA will wish to revisit the subject of the current conditions in Romania, in light of the time that has elapsed and the evolving nature of the Romanian political scene.

B. *Withholding of Deportation*

 We now turn to Borca's application for withholding of deportation. Section 243(h) provides, in pertinent part: "The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom *would be threatened* in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1) (emphasis added). This standard has been interpreted as requiring petitioners to establish that they face a "clear probability" of persecution in the future. *INS v. Stevic,* 467 U.S. 407, 413, 104 S.Ct. 2489, 2492–93, 81 L.Ed.2d 321 (1984); *Milosevic,* 18 F.3d at 372. In other words, a petitioner must demonstrate that she will more likely than not be subjected to persecution upon deportation. *Stevic,* 467 U.S. at 429–30, 104 S.Ct. at 2501.

The BIA perfunctorily concluded that Borca had failed to meet this standard after it had determined that Borca had failed to meet the lesser standard applicable in the asylum context. Thus, in light of our decision to set aside the BIA's asylum determination, we are unable to adequately review Borca's withholding of deportation application. Accordingly, we must also reverse and remand this portion of the BIA's order.

## IV. CONCLUSION

For the reasons set forth above, the decision of the BIA in this case is affirmed in part, and reversed and remanded in part.

*Judge Loken would grant the suggestion for re-

AFFIRMED, in part, and REVERSED and RE-MANDED, in part.