[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 16, 2006
THOMAS K. KAHN
CLERK

No. 06-11117
Non-Argument Calendar
_____

Agency Nos. A95-241-923
A95-241-924

MERARDO MORENO MORENO,
MARIBEL STELLA ALZATE GARCIA,
ANGIE CAROLINA MORENO ALZATE,
KATHERINE ZUNIGA ALZATE,
JUAN DE LOS CHRISTIAN PEREZ VALENZUELA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

**(November 16, 2006)**

Before CARNES, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

Merardo Moreno Moreno, on behalf of himself and his family,[1] petitions for review of the final order of the Board of Immigration Appeals (BIA).  The BIA's order affirmed the Immigration Judge's (IJ) denial of his application for asylum and withholding of removal under the Immigration and Nationality Act (INA).  We dismiss petitioner's claim regarding asylum because we lack jurisdiction to review the BIA's determination of the timeliness of asylum applications and deny petitioner's withholding of removal claim because substantial evidence supports the BIA's decision.

## I.  Background

Moreno entered the United States on March 5, 1995; Valenzuela entered on March 9, 1997; and Garcia, Angie and Katherine entered the United States on October 26, 1997.  All of the petitioners arrived in this country on tourist visas and remained past the expiration date of those visas.  Accordingly, the INS[2] issued all of them notices to appear, charging them with removability under INA § 237(a)(1)(B).

---

[1] Moreno brings a consolidated petition on behalf of his wife Maribel Stella Alzate Garcia, his minor daughter Angie Carolina Moreno Alzate (Angie), his adult daughter Katherine Zuniga Alzate (Katherine), and her husband Juan de los Perez Valenzuela.  All of the petitioners are natives and citizens of Columbia besides Valenzuela who is a native and citizen of Chile.

[2] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.  The act created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department.  Because this case began before the transfer, this memorandum refers to the INS.

In 2002, seven years after entering the country, Moreno applied for asylum and withholding of removal under both section 241(b)(3)(B) of the INA and the Convention Against Torture (CAT).[3]  In his application, Moreno described a series of threats and attacks against himself and his family in Columbia from 1992 to 2002.  Moreno alleged that he was persecuted by the Revolutionary Armed Forces of Columbia (FARC) because of his work as a forensic investigator and his political activities.

At the hearing conducted in 2004, all parties conceded their removability and requested asylum and withholding of removal, as well as relief under the CAT.  Moreno, his present wife Maribel Garcia, her daughter Adriana, and Moreno's former co-worker, Servando Serrano, all testified at the immigration hearing.[4]

Moreno testified that he first began working as a criminal investigator in 1990 and took a full-time position after he graduated from university in 1992.  Moreno served in the prosecutor's office in Barranquilla, Columbia; his work

---

[3]  Moreno offered no argument in his brief regarding the CAT.  Although the petitioner refers to the CAT in his statements of jurisdiction and issue, no objection to the BIA's ruling on the CAT is made in the brief.  Therefore, he has abandoned that argument.  Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 (11th Cir. 2005).

[4]  Throughout his testimony, Moreno had difficulty remembering the dates and chronology of his work in Columbia.  What follows is a reconstruction of the testimony from the record.  It is notable that the petitioner's brief does not attempt to identify a specific timeline for his testimony.

involved technical crime scene investigations primarily for narcotics trafficking, money laundering, and homicide investigations.

Moreno testified that he was shot in the arm by unknown assailants during an August 10, 1992 investigation in the so-called "black zone." He reported the attack to his supervisors and they decided to take him off the case but did not investigate further.

Moreno claimed that in 1993 he was part of a large money laundering investigation, an investigation of ESCORPO, and an investigation into a coastal cartel led by Pablo Escobar. However, Moreno provided no details regarding any of these investigations. During an investigation into the killing of a large number of homeless individuals at a university, a bomb was found at the investigators' office but it did not explode.[5]

Moreno described a kidnaping attempt against Katherine and Adriana that occurred on April 26, 1993. Moreno testified that his daughters had been told that they were intercepted in retaliation for Moreno's work. He did not report the incident to any authorities.

Moreno left the prosecutor's office in July 1993 because he was told the office did not need his services anymore after the cartel investigation but Moreno

---

[5] It is unclear when this investigation occurred. Moreno claimed the incident with the bomb happened in 1993; he also had testified that the bodies of the homeless had been found in 1994.

4

believed that his office may have been infiltrated by guerrillas and other traffickers.

Moreno testified that he received threatening phone calls in January of 1994.[6] He further stated that in February 1994, after he had left the prosecutor's office, he was at a bar in Barranquilla with friends when a stranger walked into the bar and fired a gun at Moreno. The unidentified man fled, but the police did not file a report because no one was hurt.

In April 1994, Moreno became an investigator for the private financial firm, Colpatria in Bogota, Columbia. He testified that he investigated several money laundering schemes that he believed were committed by FARC guerrillas.

Servando Serrano, a former police officer in Columbia, testified that he had worked with Moreno at Colpatria. He knew that Moreno had been shot at during the time he worked there. Serrano also stated that only approximately 25% of crimes are reported to the police and testified broadly regarding his knowledge of Columbian drug cartels.

In addition to his professional investigative work, Moreno stated that he was involved in politics with the Liberal party and served as a "community leader" who helped provide food and medicine to the less fortunate. After a political meeting

---

[6] Moreno's testimony was confused as to where he was living when he received these threats.

5

on January 20, 1995 discussing "safety problems" that community leaders were having, Moreno was accosted by a man who called out Moreno's name, calling him a "snitch" and a "brown nose," and fired shots at him.

Moreno was unharmed by the incident, but several days later he received threatening phone calls from a self-identified FARC member. Moreno testified that it was at this point that he decided he and his family needed to flee Columbia. However, on cross-examination, it was revealed that he had applied for and received his visa to enter the United States on January 6, 1995 before the last incidents occurred.

Moreno entered the United States on March 5, 1995 with Garcia's parents. On March 28, while Garcia and her daughters were still in Columbia, Adriana was raped by two men while she was walking through a park on her way home from a friend's house. Moreno testified that Adriana's attackers told her that their attack was in response to Moreno's cartel investigations. The police were not notified of this crime. Garcia and her daughters left Columbia for the United States on April 1, 1995.

While Moreno continued to live in Florida with Garcia's parents and Adriana,[7] Garcia left the United States after several months and returned to Columbia to live with Moreno's parents in Bogota with her daughters Angie and

---

[7] Adriana is not a petitioner in this proceeding.

6

Katherine.  Moreno explained that he did not want Garcia to return to Columbia and that he stayed in Florida to care for Garcia's parents who were in poor health.

On cross-examination, Moreno admitted that despite referring to Maribel Garcia as his wife throughout the hearing, he did not marry her until 2002 and was, in fact, married to another woman in Florida in 1997 although he never lived with her and they have since separated.  Garcia explained that she and Moreno had lived together since 1992, except from 1995-97, and were married in 2004.

Garcia testified to the 1993 kidnaping attempt against Adriana and Katherine, the 1995 rape of Adriana, and that Moreno fled Columbia because he was threatened by FARC.  Garcia testified that she did not seek medical care for Adriana after the rape because she did not want anyone to know though Adriana had received psychological counseling previous to the rape.

Adriana also testified. She described her rape and stated that the men told her it was because Maribel and Moreno had been "sticking their noses where they were not wanted."  Adriana also explained that she did not seek any counseling in the United States because she felt secure here.

In 1997, while Garcia was working for the Liberal Party in San Mateo, Columbia, men approached her with pictures of her daughters and told her that FARC planned to kidnap them.  Garcia took Angie and Katherine by bus to Bogota, but guerrillas intercepted the bus and attempted to kidnap the girls and

7

beat Garcia. However, the Columbian army intervened and prevented the attack. After this incident, Garcia and her daughters returned to the United States.

Both Moreno and Garcia testified that they applied for asylum after Garcia's brother and sister-in-law were attacked at a mall in Columbia in September of 2001. The brother had also informed Garcia that callers identifying themselves as FARC members had called him looking for Moreno. Moreno testified that he did not apply for asylum earlier because he was busy taking care of Garcia's parents. Garcia's parents also applied for asylum at the same time and based their claims on their own political activities as well as Moreno's job and were eventually granted asylum.

In support of the applications, Moreno submitted copies of the 1992, 1993 and 2002 Country Reports, and the 1997 State Department Country Profile. The reports acknowledged the violence stemming from FARC activities and drug traffickers. Moreno also submitted Garcia's parents' asylum application, in which they asserted that they had been threatened and persecuted due to their involvement in the Health Brigades and Liberal Party, as well as due to Moreno's investigations. They stated that they had received threatening calls when Moreno investigated the coastal cartel, and that their granddaughters had been threatened to "pay a debt." Moreno also submitted the following: (1) a letter from Garcia's brother informing her that he had been attacked and threatened in January 2002 by

FARC members who were looking for Moreno and Garcia; (2) a letter from Colpatria confirming Moreno's position with the company; (3) a memorandum addressing the threats Moreno received as a result of his investigations; (4) a letter from his church requesting asylum for Moreno and his family; and (5) statement from the Liberal Party confirming Garcia's involvement.

The IJ denied all relief on April 30, 2004. The IJ found that Moreno's application for asylum was untimely and there were no extraordinary circumstances to excuse the late filing. The IJ held that the untimely application was not excused by Moreno's care-taking and financial responsibilities especially because he did have the time to meet and marry another woman while living in the United States. Furthermore, the IJ found it incredible that Moreno was only motivated to apply for asylum after his brother-in-law was attacked in Columbia in 2002 but not before.

The IJ also found that Moreno failed to meet his burden of proof to withhold removal under the INA or the CAT. The IJ found Moreno's testimony was not credible, noting that his testimony was vague, confusing, internally inconsistent, illogical, and filled with implausibilities. The IJ ruled that Moreno was unable to show that he has a well-founded fear of persecution because he failed to show that the alleged attacks and threats were made on the basis of Moreno's political

9

opinion. Moreno also failed to establish any fear of torture at the hands of a public official.

Moreno appealed the IJ's decision, arguing that the IJ erred in finding that the untimely application was unexcused and contesting the IJ's credibility determinations. After remanding the case to perfect the record, the BIA affirmed the IJ's decision on appeal.

The BIA found no error in the IJ's determination that the Moreno's untimely application for asylum was not excused and held that Moreno was statutorily ineligible for asylum.

The BIA also upheld the IJ's denial of withholding of removal because the IJ's factual findings were not clearly erroneous. The BIA specifically noted the differences in Moreno and Adriana's testimony about Adriana's rape, the ambiguities regarding Moreno's decision to move from Barranquilla to Bogota, and the failure to report the rape when the family had been willing to report a less serious incident. Finally, the BIA found that the Moreno had failed to show that he would, more likely than not, be subject to torture by or with the acquiescence of a public official upon removal to Columbia.

After the BIA's decision, Moreno petitioned this court for review.


II. Standard of Review

10

We review matters of subject-matter jurisdiction de novo. Brooks v. Ashcroft, 283 F.3d 1268, 1272 (11th Cir. 2002). We also review the BIA's legal conclusions de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001).

In removal cases, we review the decision of the BIA and the decision of the IJ insofar as it is adopted by the BIA. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001); Reyes-Sanchez v. United States Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004). Here, the BIA accepted the IJ's credibility findings. We review the IJ's findings of fact under the substantial-evidence test, and we must affirm the decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Antipova v. United States Att'y Gen., 392 F.3d 1259, 1261 (11th Cir. 2004) (quotations omitted). "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). We also review the IJ's credibility determinations under the "substantial evidence" test, and we may not substitute our judgment for that of the IJ. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004).

III. Discussion

11

In his petition for review, Moreno raises two issues. First, Moreno contends that the BIA erred in determining that his application for asylum was untimely. The government argues that we lack subject matter-jurisdiction to review the timeliness of Moreno's petition. The government is correct.

An alien may seek asylum if he "demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States."[8] INA § 208(a)(2)(B); 8 U.S.C. § 1158(a)(2)(B). An untimely application may be considered, however, if the alien shows extraordinary circumstances for the delay in filing a timely application. INA § 208(a)(2)(D); 8 U.S.C. § 1158(a)(2)(D).

We lack jurisdiction to review the BIA's determination that Moreno's application was untimely and unexcused by extraordinary circumstances. In Fahim v. U.S. Att'y Gen., this court held that "federal courts do not have the jurisdiction to review the Attorney General's decision as to timeliness." 278 F.3d 1216, 1217 (11th Cir. 2002). The holding in Fahim is compelled by 8 U.S.C. § 1158(a)(3)

---

[8] The one-year period begins either on the date of the alien's last arrival in the United States or April 1, 1997, whichever is later. 8 C.F.R. § 208.4(a)(2)(ii). Here, Moreno entered the United States in 1995. Thus, he had one year from April 1, 1997 to file his application. He did not file until 2002. Additionally, Maribel, Angie, Katherine, and Juan entered the United States after the April 1, 1997 start date. Thus, they had until 1998 to file their applications; they did not file for asylum until 2002.

12

which explicitly strips federal courts of the power to review agency determinations of timeliness.

The second issue is whether substantial evidence supported the BIA's decision to affirm the IJ's decision to deny withholding of removal. The IJ made an adverse credibility determination about Moreno's testimony and found that Moreno did not meet his burden of establishing a clear probability of persecution.

An alien seeking withholding of removal under the INA must show that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A); Mendoza, 327 F.3d at 1287. An alien bears the burden of demonstrating that he more-likely-than-not would be persecuted or tortured upon his return to the country in question. Mendoza, 327 F.3d at 1287. This standard is more stringent than the well-founded fear standard for asylum claims.[9] D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 819 (11th Cir. 2004).

If an alien's testimony is credible, it may be sufficient, without corroboration, to satisfy his burden of proof in establishing his eligibility for relief

---

[9] At least one circuit has held that the definition of terms like "persecution" as used in the withholding context have the same meaning as when used in the asylum context. Borca v. INS, 77 F.3d 210, 215 (7th Cir. 1996).

13

from removal.[10]  8 C.F.R. §§ 208.13(a), 208.16(b); Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005).

Conversely, as is the case here, an IJ's denial of relief can be supported solely by an adverse credibility determination, especially if the alien produces no corroborating evidence.  Forgue, 401 F.3d at 1287.  If, however, the applicant produces other evidence of persecution, the IJ must consider that evidence, and should not rely solely on an adverse credibility determination in those cases.  Id.  If the IJ determines that the alien lacked credibility, the IJ must offer specific, cogent reasons for the finding; the burden then shifts to the alien to show that the IJ's credibility decision was not supported by "specific, cogent reasons" or was not based on substantial evidence.  Id.

"Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments."  Ruiz v. U.S. Att'y Gen. 440 F.3d 1247. 1255 (11th Cir. 2006); In re B-, 21 I & N Dec. 66, 70 (BIA 1995); see also Dailide v. U.S. Att'y Gen., 387 F.3d 1335, 1343 (11th Cir. 2004).  An adverse credibility finding must go to the heart of the claim, and not be based on minor discrepancies, inconsistencies, and omissions.  See Lui v. U.S. Att'y Gen., 156 Fed. Appx. 270 (11th Cir. 2005) (unpublished) (citing Gao

---

[10] "However, the weaker the applicant's testimony, the greater the need for corroborative evidence."  In re Y-B, 21 I&N Dec. 1136, 1139 (BIA 1998).

14

v. Ashcroft, 299 F.3d 266, 272 (3rd Cir. 2002); Akinmade v. INS, 196 F.3d 951, 954 (9th Cir. 1999)).  A single inconsistency may be sufficient to support an adverse credibility finding if the inconsistency relates to the alien's basis for his fear and goes to the heart of his asylum claim.  See id. (citing Chebchoub v. INS, 257 F.3d 1038, 1043 (9th Cir. 2001)).

Here, the IJ and BIA cited specific instances in Moreno's testimony that were inconsistent or implausible.  Specifically, the BIA cited the following: (1) the family's conduct after Adriana's rape; (2) Moreno's decision to move to Bogota, but leave his family in Barranquilla after the threats; (3) the failure to report the rape, but the decision to report a less severe attack on Garcia's brother; (4) allowing a young girl to walk alone at night given the threats and the previous kidnaping attempt.

In this case, the adverse credibility determination is supported by substantial evidence.  In addition to the inconsistencies and implausibilities cited above, it is noteworthy that Garcia returned to Colombia after coming to the United States, which seems strange in light of the threats.  Importantly, she returned to Colombia with Moreno's young daughter, and it is unclear why he would have permitted Garcia to take the girl to Colombia if he feared for his children's safety. Additionally, Moreno's parents have not been threatened or attacked despite

Moreno's activities, which supports the conclusion that FARC's conduct was not connected to Moreno, but rather with Garcia's family.

Moreover, Moreno did not give detailed explanations about his investigations or his involvement with the Liberal Party, other than to give the IJ the name of the investigations. Moreno was frequently confused about dates and locations of the attacks and threats. Finally, his description of the attackers motivation for Adriana's rape did not match the testimony Adriana herself gave.

In light of this record, Moreno has not met his burden of showing the adverse credibility determination was unsupported by specific and cogent reasons. Accordingly, we should defer to the IJ's and BIA's determination that Moreno had not shown past persecution or a well-founded fear of future persecution.

To qualify for withholding of removal based on persecution by a guerilla group on account of a political opinion, Moreno must establish that the guerillas persecuted him or will seek to persecute him in the future because of his actual or imputed political opinion. Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004). Additionally, "[p]urely personal retribution is, of course, not persecution on account of political opinion," but mixed-motive persecution may qualify if one of the motives is political. Id. (citing Grava v. INS, 205 F.3d 1177, 1181 n.3 (9th Cir. 2000); Abdille v. Ashcroft, 242 F.3d 477, 494-95 (3d Cir. 2001) (finding that evidence consistent with acts of private violence or that merely shows

16

that an individual has been the victim of criminal activity does not constitute evidence of persecution on a statutorily protected ground)). "Persecution on account of . . . political opinion . . . is persecution on account of the <u>victim's</u> political opinion, not the persecutor's." <u>INS v. Elias-Zacarias</u>, 502 U.S. 478, 482, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992).

The BIA's determination is supported by substantial evidence, and the record does not compel a different conclusion. Here, Moreno has not shown that the alleged incidents and threats were <u>on account of</u> his political opinion, either his investigations or his involvement with the Liberal Party. First, as noted, Moreno did not give specifics about his investigations into the drug cartels or his activities in the Liberal Party. He was confused about the dates of the investigations, and there is no record of the coastal cartel in any of the country or state department reports. Moreno's testimony showed that his family had never been threatened and that Garcia did not experience any trouble after her return to Colombia until she began political activities. Additionally, it is unclear whether Moreno experienced any threats after his move to Bogota.

Second, this court has recognized that most people in Colombia face violence at the hands of guerillas. <u>Castillo-Arias v. U.S. Att'y Gen.</u>, 446 F.3d 1190, 1198 (11th Cir. 2006). Moreover, the IJ concluded that the alleged incidents

17

seemed to be related to Garcia's activities and the activities of her family rather than to Moreno and his family.[11]

In light of this testimony, the record does not compel the conclusion that Moreno established past persecution on account of his opinion or that it is more likely than not that he would be persecuted if he returned.

## IV.  Conclusion

First, we lack jurisdiction to rule on the BIA's determination that Moreno's application was untimely and therefore DISMISS his petition regarding the application for asylum.  Second, the BIA's determination that Moreno is ineligible for withholding of removal is entitled to deference, and therefore we DENY the petition regarding withholding of removal.

---

[11]  Importantly, Garcia did not submit her own asylum application, but proceeds as a rider on Moreno's application.  Thus, she does not have separate claims, and whether she could establish eligibility independent of Moreno is not properly before us.

18