Vasile DOBRICAN, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 95–1540.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1995.

Decided Feb. 22, 1996.

Ferenc P. Vandor, Ira Kahn (argued), Chicago, IL, for Petitioner.

Janet Reno, Office of United States Attorney General, Washington, DC, Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL, James B. Burns, Office of United States Attorney, Chicago, IL, Richard M. Evans, William J. Howard, Robert Kendall, Jr., Stephen W. Funk, Terri J. Lavi (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before FLAUM, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The seismic changes that rippled across the face of Central and Eastern Europe in the early 1990s left a markedly different social and political landscape. While these momentous events were taking place, the United States Immigration and Naturalization Service (INS) continued to receive applications for political asylum from refugees

whose claims arose under the *anciens re-gimes*, but who continued to fear abusive treatment in the uncertain new world. Vasile Dobrican is one of those applicants. Conceding his deportability, he asked the INS to grant him political asylum and withholding of deportation, or, in the alternative, the right to voluntary departure. The Immigration Judge (IJ) denied the first request and granted the second one. On appeal, the Board of Immigration Appeals (BIA) upheld the IJ's decision. We affirm.

## I.

Dobrican is a native and citizen of Romania who is now in his mid-thirties. He entered the United States on March 12, 1989, as a nonimmigrant visitor and has stayed ever since. · On October 16, 1990, he applied for asylum pursuant to § 208(a) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1158(a), on the ground that he had a well founded fear of persecution due to his status as a practicing Jehovah's Witness. The INS Chicago Office of Asylum denied that application on September 26, 1991, and followed up on December 6, 1991, with deportation proceedings under § 241(a)(1)(B) of the INA, 8 U.S.C. § 1251(a)(1)(B).

On May 17, 1992, Dobrican filed a second application for asylum and for withholding of deportation with the Executive Office for Immigration Review. In response to that application, the State Department's Bureau of Human Rights and Humanitarian Affairs (BHRHA) issued an advisory report, on August 19, 1992, noting that:

> [t]he applicant's case appears to be based on his being a Jehovah's Witness. However, there is freedom of religious observance in Romania, with no generalized impediment to or sanction against Jehovah's Witnesses or indeed other groupings in that country.

A number of hearings followed at which Dobrican had the opportunity to develop the facts behind his fear of persecution. On April 16, 1993, the IJ issued a written decision denying the applications for asylum and withholding of deportation, but allowing him four months to depart from the United States voluntarily. Dobrican took a timely appeal from that decision to the BIA which affirmed the IJ's order and dismissed the appeal.

## II.

Dobrican began life in Jud–Satu–Mare, a small village of approximately one thousand families in Romania. Only thirty out of that thousand were Jehovah's Witnesses. Under the notorious Communist government led by Nicolae Ceausescu, Jehovah's Witnesses suffered significant harassment and persecution by both governmental personnel and private citizens. Jehovah's Witnesses were not allowed to meet with one another, and they were forced to conduct their religious services in secret. Dobrican himself recalled that he was harassed in high school because of his religion, particularly because his religious beliefs were inconsistent with his joining the Young Communist Party.

Matters became worse when Dobrican was compelled to serve in the Romanian military. Despite the fact that he had conscientious objections to military service (as a Jehovah's Witness Dobrican objected to bearing arms and taking an oath of military allegiance), he was conscripted in 1982 at the age of twenty. The authorities initially told Dobrican that he could satisfy his service obligation by performing "noncombat civilian service." This proved to be untrue. When he reported for duty, he discovered that he had been assigned to a military combat unit. His commanding officers were unsympathetic to his complaints. When he became ill after a stint of sleeping outdoors and serving on sentinel duty, the military doctors accused him of malingering. One doctor remarked that he should "go and ask Jehovah to give [him] medication." On another occasion, a lieutenant gave Dobrican a severe beating after he had fainted during drill exercises.

By September 1982, after hospitalization for the beating, Dobrican was released from military service on a medical discharge. For the next seven years he received a military pension from the Romanian government. His situation threatened to change, however, in November of 1988, when he was found to be capable of completing his required mili-

tary service and he received an order to report again for duty. It was shortly thereafter that Dobrican left Romania for the United States. Some nine months later, in December 1989, the Ceausescu government fell and Ceausescu himself met a violent end.

Although Dobrican acknowledges that the present government of Romania is headed by President Ion Iliescu, he disagrees with the BHRHA assessment of that government's democratic and nondiscriminatory character. He argued before the IJ that he still feared persecution both for being a Jehovah's Witness and for not fulfilling his military duty. Dobrican recounted statements by his mother advising him to stay in the United States because Jehovah's Witnesses in their village must still practice in secret, and he asserted that the current Romanian government's policies toward his religious group have not changed materially from its predecessors. Vasile Poptile, Dobrican's brother-in-law who was visiting the United States at the time of the hearing, also testified that Jehovah's Witnesses continue to met in secret and are still subject to some harassment by the local population and government.

### III.

■ This Court reviews decisions of the BIA deferentially. We must uphold the Board's determination "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). See *Anton v. INS,* 50 F.3d 469, 472 (7th Cir.1995). Conversely, we may reverse a BIA determination in an asylum case only if the evidence presented "was such that a reasonable fact finder would have to conclude that the requisite fear of persecution existed." *INS v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). In a case such as this one, where the BIA adopts the reasoning of the IJ, we have held that the BIA adequately explains its decision when it adopts the IJ's decision, and we base our review solely on the IJ's analysis. *Urukov v. INS,* 55 F.3d 222, 228 (7th Cir.1995); *Cuevas v. INS,* 43 F.3d 1167, 1170 (7th Cir.1995).

■ Dobrican claims that the BIA abused its discretion both in its failure to give mean-

ingful review to the IJ's decision and in its failure to grant him the relief he requested. With respect to the procedural point, the IJ wrote a detailed opinion setting forth the factual basis for his decision and explaining his credibility determinations. While it is true that the BIA order is brief, the order indicates that the Board reviewed the relevant materials in the record and it concluded that the IJ did not err. Our cases require no more. See *Urukov,* 55 F.3d at 228; *Cuevas,* 43 F.3d at 1170.

■ Dobrican's underlying asylum claim fares no better. In order to be eligible for asylum, an alien must establish a "well founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 208(a); 8 U.S.C. § 1101(a)(42). To show a "well founded fear" a petitioner must demonstrate both that the fear is (subjectively) genuine and that it is reasonable in light of the (objective) credible evidence. *Mitev v. INS,* 67 F.3d 1325, 1331 (7th Cir.1995); *Demirovski v. INS,* 39 F.3d 177, 180 (7th Cir. 1994).

The IJ·found that Dobrican failed to present facts showing either that he suffered from religious persecution in the past or that he was likely to suffer religious persecution in his changed homeland. Like the petitioner in the Supreme Court's *Elias–Zacarias* decision, Dobrican's real complaint was that he was likely to be punished for his refusal to serve in the military. In *Elias–Zacarias,* the Court rejected the argument that this was the legal equivalent of persecution on account of political opinion under 8 U.S.C. § 1101(a)(42). *Elias–Zacarias,* 502 U.S. at 482–483, 112 S.Ct. at 815–816. In the later case of *Canas–Segovia v. INS II,* 970 F.2d 599, 601 (9th Cir.1992), the Ninth Circuit applied *Elias–Zacarias* to facts very similar to ours. It noted that when a refusal to serve in the military could stem from many causes, some protected and others not, the victim must show that the persecutor had a protected basis in mind (such as the victim's religion) in undertaking the persecution. *Canas–Segovia,* 970 F.2d at 601. Even assuming that the actions about which Dobrican

complained amounted to persecution, he did not show any particular religious basis for his persecution. To the contrary, both he and his brother-in-law testified that the military would punish all soldiers who failed to follow orders equally. Without more, this evidence does not demonstrate a well founded fear of persecution on account of religious beliefs.

In its later decision in *Fisher v. INS,* 61 F.3d 1366 (9th Cir.1994), the Ninth Circuit noted that persecution might also include being forced to engage in conduct that is abhorent to one's own religious beliefs. *Id.* at 1376. If Dobrican had made any showing before the IJ that today's Romanian military would fail to accommodate his religiously based pacificism, this might be a different case on the facts, in which we would need to address that issue. However, he did not, nor did he show that he would be punished for his conduct during his past brief military service. (Such a claim would have been hard to sustain, given the fact that the Romanian military paid him a pension for seven years.)

Dobrican offered some testimony, both from his brother-in-law and personally, that discrimination against Jehovah's Witnesses continues to exist in today's Romania. Putting to one side the rather vague and anecdotal nature of this evidence, Dobrican's principal problem is that the IJ had before him the contrary report from the BHRHA. The judge chose to resolve the dispute over conditions in today's Romania in favor of the INS. Reviewing his opinion as a whole, we cannot say that it was unsupported by reasonable, substantial, and probative evidence. Dobrican had a significant burden of proof to begin with and the IJ was well within the bounds of reason to conclude that he did not meet it.

██ The standard for withholding of deportation is even more stringent than the standard for asylum. The alien must establish that his deportation to a particular country would threaten his life or freedom because of his "race, religion, nationality, membership in a particular social group, or political opinion." INA § 243(h); 8 U.S.C. § 1253(h)(1). There must be a "clear probability" of persecution, meaning that it is "more likely than not that he will be persecuted upon return." *Demirovski,* 39 F.3d at 180. The "clear probability" standard thus goes significantly beyond the "well founded fear of persecution" standard that applies in asylum cases. Here, because the IJ's decision that Dobrican failed to demonstrate a well founded fear of persecution is supported by substantial evidence, it logically follows that the IJ's concurrent determination that he failed to demonstrate a "clear probability of persecution" is also supported by the evidence. See *Mitev,* 67 F.3d at 1333; *Anton,* 50 F.3d at 473.

## IV.

In countries that are undergoing rapid political transitions it is difficult at best to make predictions about the risk of persecution that may still exist for any given individual. Nevertheless, this is the task that has been entrusted in the first instance to the INS and its appellate administrative bodies. A reviewing court is neither likely to do that job better than the agency, nor is it authorized to re-do the agency's work. The court can only make sure that proper procedures were followed, that an adequate explanation appears in the record, and that substantial evidence supports the agency's decision. We find nothing in Dobrican's arguments to cast doubt on the IJ's and BIA's decisions, and we therefore AFFIRM.