Igor BEREZA, Petitioner,

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.**

No. 96–3041.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 20, 1997.

Decided May 30, 1997.

470

Scott D. Pollock (argued), Winston T. Rego, Pollock & Associates, Chicago, IL, for Petitioner.

Samuel Der-Yeghiayan, Immigration & Naturalization Service, Chicago, IL, Mark C. Walters (argued), David M. McConnell, Emily Radford, Stephen W. Funk, Department of Justice, Civil Division, Kristal A. Marlow, Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before POSNER, Chief Judge, and ESCHBACH and MANION, Circuit Judges.

ESCHBACH, Circuit Judge.

Igor Bereza does not want to return to Ukraine,[1] his home country. He concedes that he is deportable, he overstayed his visitor's visa, but seeks asylum in the United States on the grounds that he was persecuted when he lived in Ukraine and has a well-founded fear that he will be persecuted if he is forced to return. The immigration judge held that Bereza is not eligible for asylum and the Board of Immigration Appeals ("BIA") agreed. Bereza now appeals the BIA judgment. We have jurisdiction under 8 U.S.C. § 1105a(a).[2] We affirm.

---

1. Although the parties refer to "the Ukraine," we opted to follow the convention used by the State Department in its report, *Ukraine—Profile of Asylum Claims and Country Conditions*, and refer to the nation simply as "Ukraine."

2. On September 30, 1996, the President signed into law the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009 (1996), which amends much of the Immigration and

## I. Background

Igor Bereza, a Ukrainian citizen, first came to the United States in 1989 on a visitor's visa. In 1990, he returned to Ukraine for a period of six to seven months to arrange for his parents to come to the United States. When he returned to the United States in December 1990, it was with permission to stay until June 1991. In February 1992, Bereza's parents were granted political asylum. Bereza states that his asylum request was originally to be considered with his parents' cases, but he was unable to be interviewed at the time because he was hospitalized with a heart condition. In April 1994, the Immigration and Naturalization Service ("INS") denied Bereza's request for asylum and instituted deportation proceedings. Bereza conceded deportability, but renewed his application for asylum and withholding of deportation.

Bereza's mother, Anna Bereza, was a political prisoner in a Soviet labor camp under Stalin during the 1940s. She married and had her son (Igor) after her release. Because of Mrs. Bereza's anti-Stalinist activities, her family was perpetually branded as an enemy of the state. As a result, Bereza suffered discrimination in schooling and at work. In ninth grade, Bereza was falsely accused of breaking rules during summer camp and was threatened with expulsion if he did not apologize. The chief counselor knew Bereza had done nothing wrong, but said that no one would believe him because of his mother's past imprisonment. Later, when Bereza was seventeen or eighteen years old, he was told that regardless of how well he did in school, he would not be rewarded and would not be able to go to a good school later on because of his mother's past. This prediction came true. Although Bereza

---

Nationality Act, 8 U.S.C. § 1101, et seq., and repeals 8 U.S.C. § 1105a. Because of its effective date, however, the IIRIRA does not apply to this case. *See* IIRIRA §§ 306(c)(1), 309, and 604(c) (set out as notes under 8 U.S.C.A. §§ 1252, 1101, and 1158 respectively). Thus, throughout the opinion we refer to the pre-IIRIRA version of the Immigration and Nationality Act.

wanted to study medicine or engineering, these options were closed to him. Instead, he went to a forestry college. When he graduated in 1978, Bereza was denied honors despite his good grades. The Communist party representative for Bereza's class informed him that he would never receive honors, regardless of his diligence, because his mother was a public enemy. After graduation, Bereza received what was considered a bad placement at a plywood manufacturing plant.

In 1987, when greater political freedom seemed possible under Gorbachev's policies of *perestroika* and *glasnost*, Bereza became politically active. Along with thousands of others, Bereza participated in demonstrations in support of greater political freedoms, in which he sometimes held signs and sometimes "spoke out." In all, Bereza took part in about fifteen demonstrations. The police ended some of these, it is unclear how many, by beating the protesters with clubs, then arresting and detaining them. Bereza was arrested twice after participating in demonstrations. The first time he was detained for only a few hours, the second time, overnight. When he was released the next morning, the personnel department at Bereza's workplace warned Bereza to stop participating in the demonstrations, or else. When Bereza continued to speak out, he was demoted from his position as a mechanical engineer, a desk job, to an outside job repairing equipment that involved heavy lifting. Bereza suffered a hernia, but was forced to continue strenuous work despite doctor's orders. The same person who had previously warned Bereza against participating in demonstrations, when presented with the doctor's orders, told Bereza he should have listened to her before. Bereza's medical difficulties continued when he began to have heart trouble. Adding to his medical problems, Bereza's finger was severed when a machine was turned on while he was repairing it. Although he has no proof, Bereza suspects that a coworker turned the machine on because of Bereza's political activities. When Bereza returned to work after this injury, again with doctor's orders against heavy lifting, he was still required to do the same heavy work. In September 1988, Bereza was fired without explanation.

Bereza claims he also was persecuted on account of his religion, Greek Catholic, inasmuch as that religion was outlawed for most of his life in Ukraine. Other than the inability to practice Greek Catholicism, Bereza did not describe any incidents of harassment or discrimination based on his religion. Bereza admitted that the church is free today, and expressed no fear of future persecution based on his religion.

Bereza testified that he is afraid to return despite the political changes in Ukraine and despite the fact that he did not have any problems when he was back in Ukraine in 1990. According to Bereza, the same people are in power, the only difference is that before the political changes "they called themselves communists and after ... they called themselves democrats." Bereza testified that he was afraid that if he went back he would be killed.

The government's evidence included both an advisory opinion and a report on Ukraine from the State Department. According to the State Department, Greek Catholicism has been legalized and is now one of the dominant religions in Ukraine. The advisory opinion indicated that although the Communist party is once again legal it was still a minority party as of 1994.[3] The report on Ukraine recognized that some of the security personnel remained the same, but indicated that because the security apparatus is now subordinate to the independent Ukrainian government, it was unlikely anyone would be persecuted for supporting Ukrainian independence.

The immigration judge ("IJ") denied Bereza's asylum claim and claim for withholding of deportation but granted him voluntary departure in lieu of deportation. On appeal to the BIA, the BIA held that Bereza did not qualify as a refugee (the prerequisite necessary to be eligible for asylum), because his

**3.** Under 8 U.S.C. § 1105a(a)(4), we must make our determination solely upon the administrative record on which the BIA's order is based. We have no information on the current status of the Communist party in Ukraine.

experiences in Ukraine did not rise to the level of persecution and he had no reasonable fear of future persecution. The BIA also held that Bereza necessarily did not meet the stricter standard for withholding of deportation. Bereza now appeals the BIA's holding that he is not eligible for asylum.

## II. Analysis

■■■ The Attorney General has discretion to grant asylum to applicants who qualify as refugees under 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(a); *see also Borca v. INS*, 77 F.3d 210, 214 (7th Cir.1996). The Immigration and Nationality Act defines a "refugee" as one who is unable or unwilling to return to his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see also Borca*, 77 F.3d at 214. The Act does not define "persecution," but we have held that to be persecution, "the conduct in question need not necessarily threaten the petitioner's 'life or freedom,' [but] it must rise above the level of mere 'harassment.'" *Borca*, 77 F.3d at 214. To establish a well-founded fear of persecution, an applicant must show both that he genuinely fears being persecuted and that his fear is objectively reasonable. *Id.*; *Mitev v. INS*, 67 F.3d 1325, 1331 (7th Cir.1995). Although a showing of past persecution ordinarily entails a presumption that the applicant has a well-founded fear of persecution, this is not so when conditions in the country from which he is fleeing have changed "to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return." 8 C.F.R. § 208.13(b)(1)(i).

■■■ A person may qualify as a refugee, and thus be eligible for asylum, based on past persecution alone when it is sufficiently severe. This is because "[t]he experience of persecution may so sear a person with distressing associations with his native country that it would be inhumane to force him to return there, even though he is in no danger of further persecution." *Skalak v. INS*, 944 F.2d 364, 365 (7th Cir.1991). However, if there is no well-founded fear of future persecution, the past persecution must have been particularly severe to render the applicant eligible for asylum. As we explained in *Skalak*,

> we must have regard for the function of the term ["persecution"] in a case such as this where the question is whether a person should be eligible for asylum, notwithstanding the absence of any danger of persecution, merely because she was persecuted in the past. The function is to identify persecution so severe that perhaps a person should not be forced to return to the country in which she underwent it even if the danger of recurrence is negligible.

*Id.* Federal regulations now make explicit that if a person does not have a well-founded fear of future persecution, the alien must have "compelling reasons for being unwilling to return" to his country of origin to be considered a refugee. 8 C.F.R. § 208.13(b)(1)(ii). *See also Bucur v. INS*, 109 F.3d 399, 405 (7th Cir.1997).

The BIA dismissed Bereza's appeal from the IJ's denial of asylum, holding that Bereza failed to show that he was persecuted or that he had a well-founded fear of persecution. First, the BIA found no basis for an asylum claim based on religion. With regard to political persecution, the BIA found that although Bereza had experienced discrimination, he was able to get a college degree and be employed and thus the discrimination did not amount to persecution. The violence and detention by police experienced during Bereza's participation in demonstrations also did not rise above harassment to the level of persecution. Nor did Bereza's work conditions amount to persecution. Finally, the BIA found it unlikely that Bereza would face persecution in the future, especially given that Bereza had no problems when he went back to Ukraine to arrange for his parents to go to the United States.

■■■ Our review of the BIA is limited and deferential. We review the BIA's interpretation of the Immigration Act *de novo*, although we defer to its interpretation if the Act is unclear and its interpretation is reasonable. *Draganova v. INS*, 82 F.3d 716, 720 (7th Cir.1996); *Borca*, 77 F.3d at 214. We review the BIA's finding that Bereza is

not a refugee, that is, that he did not suffer past persecution and has no well-founded fear of future persecution, to determine if it was supported by substantial evidence. *Borca,* 77 F.3d at 214. We can reverse the BIA's holding only if the evidence compels a contrary conclusion. *INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 815 n. 1, 117 L.Ed.2d 38 (1992); *Borca,* 77 F.3d at 214.

■ Bereza claims he was persecuted on three bases: religion, social group (belonging to a family deemed an enemy of the state), and political opinion. Because the events of alleged persecution based on his family's past and his political activism are related, we will discuss those together. But first, we discuss Bereza's religious persecution claim.

Bereza wisely does not argue on appeal that he has a well-founded fear of religious persecution. The BIA noted that the Greek Catholic church "is now the primary church in the Western Ukraine," and Bereza admitted during the hearing before the IJ that the church is free today. Thus, Bereza's religious persecution claim is based solely on alleged past persecution. Bereza argues that the BIA erred by failing to consider that past persecution, if sufficiently severe, may be enough to establish an asylum claim. However, there is no indication that the BIA thought past persecution alone would never be sufficient for asylum eligibility. Instead, it found that Bereza "has failed to demonstrate past persecution or a well-founded fear of future persecution within the meaning of the Act." In one sense it is incorrect to say that Bereza did not suffer persecution when his religion was banned and his church abolished because, as we discussed in *Bucur,* "it is virtually the definition of religious persecution that the votaries of a religion are forbidden to practice it." *Bucur,* 109 F.3d at 405. However, as noted above, the regulations require that the past persecution be particularly severe when there is no well-founded fear of future persecution if a person is to be eligible for asylum under the Act. The BIA found that "[o]ther than articulating a concern about his religion having been banned in the past, the respondent did not specify any

harm to himself on account of his religion." Bereza's inability to practice his religion may be persecution, but it is too mild to provide a compelling reason for being unwilling to return to a country where Greek Catholicism is now one of the dominant religions. *See Bucur,* 109 F.3d at 404–06; *Dobrican v. INS,* 77 F.3d 164 (7th Cir.1996). Thus, the record does not compel the conclusion that Bereza is eligible for asylum based on religious persecution.

■ Bereza contends that the only reason the record does not compel a conclusion contrary to the BIA's holding is that the IJ "cut off" his testimony. Having examined the record, however, we are unable to agree that Bereza could not have testified further about past religious persecution if he had wanted to do so. Although the record reveals that the IJ interrupted Bereza's testimony and indicated he was looking for evidence of a well-founded fear of persecution, it appears to us that Bereza could have testified further if he had so desired. The IJ was merely trying to point Bereza in what he thought was the right direction. Counsel responded to the IJ's comments, not by arguing that Bereza suffered so severely on account of his religion that he is eligible for asylum even without a well-founded fear of persecution, but that there is, in fact, a danger of future persecution. Furthermore, before wrapping up his direct examination, Bereza's counsel asked Bereza: "Is there any particular area that . . . you feel we've forgotten that you'd like the Court . . . to know about specifically regarding your asylum application?" In response, Bereza discussed his mother's activism against Stalin. When asked if there was anything to add about what happened to Bereza himself, Bereza responded: "I think I—I've told everything."

Even if the IJ did "cut off" Bereza's testimony, we are unconvinced that this is the only reason that the record does not reflect more severe religious persecution. Bereza presented documentary evidence, none of which reveals religious persecution against Bereza beyond what he described at the hearing before the IJ.[4] Moreover, nowhere

---

4. Of the documentary evidence provided, the

only additional description of religious discrimi-

does Bereza indicate what compelling reason for his unwillingness to return to Ukraine would have been revealed if only he had been allowed to testify further. Neither Bereza's brief to this court, nor his brief to the BIA, describes the evidence he was supposedly precluded from presenting. In fact, Bereza's brief to the BIA makes no mention of religious persecution against Bereza at all. Thus, this argument is foreclosed on appeal. *See Marquez v. INS,* 105 F.3d 374, 381 (7th Cir.1997) (refusing to reverse BIA decision that did not address theory of persecution when theory was not stressed before the BIA); *Guentchev v. INS,* 77 F.3d 1036, 1038 (7th Cir.1996) (holding argument not made to BIA, even though BIA could have received additional submissions, foreclosed).

■ With regard to Bereza's claims of persecution on account of his family history and political activism, substantial evidence supports the BIA's conclusion that he neither has a well-founded fear of persecution nor has suffered persecution in the past under the terms of the Act. Specifically, because Bereza does not have a well-founded fear of future persecution, Bereza's past ordeals are not severe enough to provide him with compelling reasons for being unwilling to return to Ukraine.

Bereza asserts that the BIA erred in finding that he did not have a well-founded fear of persecution. Bereza challenges the BIA's assessment of his return visit to Ukraine, a six or seven month visit during which Bereza experienced no acts of alleged persecution, as indicating that Bereza's fear of future persecution is not well-founded. According to Bereza, the BIA did not sufficiently consider that Bereza had a strong motive to return despite his fear. It may be that Bereza was genuinely afraid and yet returned anyway. But that fact does not compel the conclusion that Bereza's fear of persecution is objectively reasonable in light of the failure of anyone

in Ukraine to persecute, harass, or discriminate against Bereza during his 1990 visit.

■ Bereza alleges that the BIA failed to consider a number of other factors, but essentially takes issue with the BIA's assessment of whether he has a well-founded fear of persecution. A "well-founded fear" means not only that the fear is genuine, but that it is objectively reasonable, that is, a reasonable person in the applicant's place would fear persecution. *See Borca,* 77 F.3d at 214; *Mitev,* 67 F.3d at 1331. To establish a well-founded fear of persecution, Bereza must show that there is "a reasonable possibility of actually suffering such persecution." 8 C.F.R. § 208.13(b)(2). Substantial evidence supports the BIA's conclusion that Bereza's fear of future persecution is not reasonable. The Soviet Union has broken up, and for a time, the Communist party was illegal. Even though it is legal once again, and according to the State Department's advisory opinion, "won a sizeable block of seats in the parliamentary elections," as of 1994 it "remain[ed] a minority party." Additionally, according to a State Department report on Ukraine, although some members of the Security Service and law enforcement are the same as before Ukrainian independence, "the security services are effectively subordinated to the Ukrainian authorities, and there is little likelihood that they would now mistreat individuals because of their support for Ukrainian independence at some time in the past." Finally, contrary to Bereza's arguments, the fact that he encountered no problems on his return visit to Ukraine also supports the conclusion that his fear of persecution is not well-founded. While Bereza obviously disagrees with the BIA's assessment that his fear is not objectively reasonable, the record does not compel a contrary conclusion.[5]

nation or harassment was in Bereza's mother's asylum application, which states that she christened her children secretly "at the danger of our lives" and that she was always fired from jobs because "they" found out she was attending church. This persecution was aimed at Bereza's mother, however, not Bereza. Nor must reasonable people conclude that it provides a compel-

ling reason for being unwilling to return to Ukraine absent a danger of future persecution.

5. Because Bereza has not shown an objectively reasonable fear of persecution, he necessarily has not shown the "clear probability" of persecution required to receive a withholding of deportation. *See Mitev,* 67 F.3d at 1333.

Without a well-founded fear of persecution, Bereza must establish particularly heinous past persecution in order to show that he has compelling reasons for not returning to Ukraine despite the current lack of danger there. *Bucur*, 109 F.3d at 405; *Skalak*, 944 F.2d at 365. Bereza raises three arguments against the BIA's conclusion that he did not suffer past persecution. First, Bereza challenges the legal standard applied in evaluating his persecution claim based on the economic consequences of his family membership and political protests. The IJ in this case applied a definition of economic persecution—requiring the applicant be deprived of all means of livelihood—which we expressly rejected the following year as too strict in *Borca*, 77 F.3d at 216. In *Borca*, we held that economic persecution may be shown if the applicant deliberately was subject to substantial economic disadvantage. *Id.* If we were reviewing the IJ's decision, we would thus need to remand for application of the correct legal standard. However, we are not; we are reviewing the BIA's decision, issued five months after the *Borca* opinion. The BIA did not adopt the IJ's opinion or analysis of the law. The BIA also did not explicitly correct the IJ's mistake of law. Bereza argues that, without explicit recognition that the legal standard utilized by the IJ later was rejected in *Borca*, we cannot know that the BIA applied the correct legal standard and therefore must remand the case.

■■■■ This argument fails. We will not lightly assume that the BIA, which has considerable expertise in this area of the law, did not apply the correct legal standard. When the BIA adopts the IJ's decision, any flaws in that decision may be attributed to the BIA. *Draganova*, 82 F.3d at 720. However, in the instant case, the BIA did not adopt the IJ's decision or reasoning. The BIA has no obligation to correct an IJ's error if it does not adopt any portion of the judge's opinion (as it did not here). *See Gonzalez v. INS*, 77 F.3d 1015, 1023 (7th Cir.1996) (holding challenges to the IJ's credibility assess-

ments irrelevant when the BIA did not adopt the IJ's reasoning); *Balazoski v. INS*, 932 F.2d 638, 640 (7th Cir.1991) ("Whether the IJ used the incorrect legal standard . . . is irrelevant. We review the decision of the BIA, not the IJ.").

Nothing in the BIA's opinion itself indicates it was based on an erroneous legal standard. The BIA recognized the barriers placed in Bereza's path with regard to educational and employment opportunities, but stated that "[n]onetheless, he was able to obtain his college degree and procure employment," and thus these barriers did not rise to the level of persecution. The BIA's attention to factors which indicate that Bereza did not suffer substantial economic disadvantage is consistent with the holding of *Borca*. Moreover, the mere fact that the BIA did not explicitly correct the IJ's mistake is unremarkable, and an insufficient reason to remand, when Bereza did not argue that the IJ applied an incorrect standard for economic persecution in his brief to the BIA.[6]

■■■■ Bereza also argues that the BIA's "minimization of the relevance of the INS' grant of asylum to his parents shows that the [BIA] failed to consider the existence of persecution to the family as a social group, and its decision should be held to be an abuse of discretion." Bereza bears the burden to prove that the BIA's consideration of the evidence was inadequate, *Rhoa–Zamora v. INS*, 971 F.2d 26, 34 (7th Cir.1992); *Kaczmarczyk v. INS*, 933 F.2d 588, 595 (7th Cir.1991), yet he offers nothing but a conclusory allegation. There is simply no evidence to support the claim that the BIA insufficiently considered the discrimination aimed at Bereza on account of his family's past. To the contrary, the BIA explicitly recognized that Bereza's "ability to fulfill his educational and employment potential may have been adversely affected by his family background as the son of a woman who was punished as a political dissident." The BIA held, however, that the treatment Bereza received as a result of his family's past did not amount to

---

**6.** We are aware that Bereza submitted his brief to the BIA before we decided *Borca*, but Bereza was not without ground to object to the IJ's analysis. The same caselaw that supported *Borca*'s argument on appeal also supported Bereza's challenge to the IJ's decision before the BIA.

*See Balazoski*, 932 F.2d at 642 (stating that persecution is not limited to threats to "life or freedom"); *Kovac v. INS*, 407 F.2d 102, 105 (9th Cir.1969) (rejecting standard that required applicant to prove economic sanctions so severe as to deprive him of all means of earning a livelihood).

persecution. While the persecution of Bereza's mother may be relevant to this determination, *see Draganova*, 82 F.3d at 721, it does not compel the conclusion that Bereza himself was persecuted. The BIA did not err by "minimizing" the grant of asylum to Bereza's mother. Although the fact that his parents were granted asylum may be relevant to a discretionary decision to grant Bereza asylum, his parents' asylum status is irrelevant once it is determined that Bereza is not eligible for asylum despite any mistreatment due to his family's past.

In a last ditch effort to establish past persecution, Bereza argues that the various acts of discrimination against Bereza cumulatively amount to persecution, but that the BIA opinion "gives no indication that it considered the various elements of Mr. Bereza's claim as a pattern of persecution over many years." Bereza wants a remand so that his claim can be "reviewed again not as isolated incidents, but as complex and interrelated events which seriously threatened the lives and freedom of the Bereza family over many years." Certainly, the BIA must consider all claims made to it and give a rational explanation for its decision. *Guentchev*, 77 F.3d at 1038. But the BIA fulfills its duty when it "announce[s] its decision in terms sufficient to enable a reviewing court to perceive it has heard and thought and not merely reacted," *id.* (internal quotations omitted), as it did here. As mentioned above, Bereza bears the burden of showing that the BIA did not fully consider the evidence. *Rhoa–Zamora*, 971 F.2d at 34; *Kaczmarczyk*, 933 F.2d at 595. However, his argument that the BIA did not view the evidence cumulatively is purely speculative; Bereza gives us no reason to believe that the BIA did not consider his claim as a pattern of persecution.

Nor does the evidence compel the conclusion that Bereza's past ordeals, even when examined as interrelated events, amounted to persecution severe enough to render him eligible for asylum despite the lack of a well-founded fear of future persecution. Bereza was discriminated against both in school and at work. As a result, Bereza could not pursue his chosen career and, toward the end of his time in Ukraine, he suffered adverse consequences to his health because of a politically motivated demotion.[7] Additionally, Bereza was subject to the violent tactics the police used to end the demonstrations in which he took part, as well as short periods of detention. As deplorable as this treatment is, reasonable people could differ about whether it amounts to persecution under the Act, given the higher showing that must be made in the absence of a well-founded fear of future persecution. *See, e.g., Bucur*, 109 F.3d at 404–06 (affirming denial of asylum because past persecution was insufficiently severe given lack of well-founded fear of persecution when applicant's religion was illegal, "his school years were full of threats, discrimination, and beatings," and, after attempting to escape the country, he was beaten, starved, and tortured); *Skalak*, 944 F.2d at 365 (holding facts did not amount to past persecution sufficient for refugee status, at least where there was no fear of future persecution because of changed political circumstances, when applicant had been jailed twice for three days for interrogation and school officials harassed her because of ties to Solidarity movement in Poland); *Zalega v. INS*, 916 F.2d 1257 (7th Cir.1990) (affirming decision that applicant was not persecuted when he was repeatedly arrested and interrogated, his house was searched, his money and property were confiscated, his parents were questioned when he first left for the United States, he was fired from his job, and his request for additional property for his business was denied). On this record, we are unable to hold that the BIA's conclusion that Bereza's sufferings did not amount to persecution is unsupported by substantial evidence.

### III. Conclusion

For the reasons stated above, we AFFIRM the decision of the BIA.

cannot find differently because the record does not compel a contrary conclusion.

---

7. The BIA dismissed the idea that the injury to Bereza's finger was both deliberate and politically motivated as based on mere conjecture. We