129 F.3d 119
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Daniel MAGDICI, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 97-1915.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 10, 1997.
Decided Oct. 19, 1997.
 
 On Petition for Review of An Order of the Board of Immigration Appeals.
 Before POSNER, ESCHBACH, and COFFEY, Circuit Judges.
 
 ORDER
 
 1
 Daniel Magdici, a Romanian citizen, entered the United States in June 1994 as a visitor but stayed beyond his authorized date. After deportation proceedings were begun against him, he applied for asylum and withholding of deportation on religious and political grounds. The immigration judge (IJ) denied Magdici's application for asylum and withholding of deportation but granted him the opportunity to voluntarily depart the country. The Board of Immigration Appeals (BIA) upheld the decision of the IJ and dismissed Magdici's appeal in March 1997. Magdici appeals, contending that the summary dismissal of his petition was so deficient as to deny him due process and that the IJ's decision to deny asylum was not supported by substantial evidence. We affirm.
 
 
 2
 Magdici is a member of the Seventh Day Adventist Church. Magdici testified before the IJ that his persecution began in high school when school authorities forced him to attend classes on Saturdays, the Sabbath day for Seventh Day Adventists. He stated that he objected to attending classes on Saturdays, but was threatened with expulsion or placement in a school for juvenile delinquents if he did not comply. His parents also were called into the local police station and threatened. Thereafter, Magdici attended classes on Saturdays. After graduating from high school, Magdici worked for the Department of Transportation, a state-owned organization.
 
 
 3
 In September 1989, Magdici illegally crossed the Romanian border into Hungary. He was captured by the Hungarian border patrol, held for five days, and then turned over to the Romanian police who beat him during the two days he was held. Magdici stated that he was kicked and hit in the head with a rifle and consequently suffered a cut under his eye, a broken nose, and a broken tooth. He also testified that the Romanian police "interviewed" him as to why he left the country. He then was turned over to the local police who again interviewed him and "hit him with sticks." He subsequently was released and was fined 2,000 LEI. Before being released, Romanian authorities told Magdici that he could not leave the country and required him to report to the police every three weeks. In addition, the police forced Magdici's father to sign a statement acknowledging that if Magdici did not report to the police as required, his father would go to jail.
 
 
 4
 Magdici returned to school where he stated that the teachers "put him down," and that one teacher, a member of the secret police, hit Magdici for not telling him where he had attempted to cross the border. Magdici was drafted into the Romanian Army in 1992. He testified that when he objected to participating in military exercises on Saturdays, he was arrested and placed in a cell for six days during which time the guards would throw his food on the floor and he was forced to eat it. He ultimately submitted to participating on Saturdays because he feared that he would be mistreated or placed in a "disciplinary battalion" if he continued to resist. Magdici also testified that his dietary restrictions (as a Seventh Day Adventist he could not eat pork) were not respected and on certain days he ate only bread and tea. Magdici was honorably discharged in April 1993.
 
 
 5
 In June 1993 he participated with friends in a demonstration which was organized by the "opposition parties." Magdici was picked up by police and informed that the demonstration was illegal. He stated that while he was in police custody he again was "hit with a stick" and was fined 8,000 LEI, equal to approximately a year's salary. Magdici was issued a passport to leave the country in 1994 and was forced to sign a paper upon leaving that he would "report" back to authorities when he returned.
 
 
 6
 The IJ denied Magdici's petition for asylum, concluding that Magdici had not established past persecution or a well-founded fear of persecution. On appeal, the BIA stated in a two-paragraph order that it affirmed the decision of the IJ based upon and for the reasons set forth in that decision.
 
 
 7
 On appeal, Magdici first asserts that he was denied due process because of the summary nature of the BIA's dismissal of his appeal. This court has stated, however, that a summary dismissal by the BIA is appropriate provided that the BIA's decision "reflect[s] that it has heard and thought and not merely reacted." Cuevas v.INS, 43 F.3d 1167, 1170 (7th Cir.1993) (internal quotation omitted); see also Guentchev v. INS, 77 F.3d 1036, 1038 (7th Cir.1996). Here, the BIA specifically stated that it was affirming the decision of the IJ "based upon and for the reasons set forth in that decision." This explanation is sufficient to satisfy due process. Id.; see also Dobrican v. INS, 77 F.3d 164, 167 (7th Cir.1996).
 
 
 8
 Magdici next asserts that the IJ erred in denying asylum on the ground that he is not a refugee. We review decisions regarding the status of an applicant as a refugee deferentially and will uphold the factual determination of whether an applicant is a refugee if it is supported by "reasonable, substantial, and probative evidence" on the record. Dobrican v. INS, 77 F.3d 164, 167 (7th Cir.1996) (citations omitted). In order to be entitled to asylum an alien must qualify as a refugee under 8 U.S.C. § 1101(a)(42). Krastev v. INS, 101 F.3d 1213, 1216 (7th Cir.1996). An alien may demonstrate refugee status by establishing "[past] persecution" or a "well-founded fear of persecution." 8 U.S.C. § 1101(a)(42); Milosevic v. INS, 18 F.3d 366, 370 (7th Cir.1994). The alien bears the burden of proving his status as a refugee. 8 C.F.R. § 208; Milosevic, 18 F.3d at 370.
 
 
 9
 Magdici asserts that he fears future persecution because of the mistreatment he received before leaving Romania on account both of his political activism and his membership in the Seventh Day Adventist Church. "To establish a well-founded fear of persecution, an applicant must show both that he genuinely fears being persecuted and that his fear is objectively reasonable." Bereza v. INS, 115 F.3d 468, 472 (7th Cir.1997). Changed political and social conditions are among the most relevant factors in evaluating the reasonableness of one's fear of persecution. See Mitev v. INS, 67 F.3d 1325, 1332 (7th Cir.1995). The IJ noted that the State Department report on Romania indicated that the political environment in Romania had changed since the fall of the Ceausescu regime, and that fear of future persecution based on either his political or religious beliefs was not well-founded. See Bucur v. INS, 109 F.3d 399, 404 (7th Cir.1997); Dobrican, 77 F.3d at 166.
 
 
 10
 In addition to a well-founded fear of future persecution, Magdici may attempt to receive refugee status by showing that he suffered persecution in the past. Marquez v. INS, 105 F.3d 374, 379 (7th Cir.1997). However, because Magdici has failed to demonstrate a well-founded fear of future persecution, he must have "compelling reasons for being unwilling to return" to Romania based on his past persecution. 8 C.F.R. § 208.13(b)(1)(ii); see also Bucur, 109 F.3d at 405. As proof that he was persecuted for his religious beliefs, Magdici states that he was forced to attend high school classes on Saturdays, his Sabbath, and was mistreated, both physically and verbally, by his teachers as a result of his religious beliefs. While such actions may have been discriminatory, they do not rise to the level of persecution. Bucur, 109 F.3d at 403-04 (Ukrainian petitioner who had been "picked on" in school and whose entrance exam scores were falsified to her detriment had not suffered past persecution).
 
 
 11
 Magdici also claims that he was persecuted because he was a Seventh Day Adventist when he was beaten by Romanian border police in 1989 after telling them that he tried to escape for religious reasons. However, he fails to establish that he was beaten because of his religious beliefs rather than fleeing the country illegally. He also states that he was persecuted when he was incarcerated for six days while in the Army for refusing to participate in military exercises on Saturdays, and, was forced to eat food off the floor during his time in jail. Again, such treatment does not constitute persecution. Cf. Dobrican, 77 F.3d at 167-68 (concluding that petitioner had not established a well-founded fear of religious persecution for refusing to serve mandatory term in Romanian Army due to his beliefs as a Jehovah's Witness). Moreover, Magdici has not demonstrated that the adverse treatment he received was related to his religious beliefs rather than his failure to participate in the required military exercises.
 
 
 12
 Further, although he contends in his brief that he was "prohibited completely" from going to church after June 1993, his responses to the IJ's questioning indicate that in fact he attended church twice a month on average from 1993 until his departure in 1994.[1] A.R. at 66-67, Tr. at 43-44.
 
 
 13
 In light of the fact that Magdici has not demonstrated that he suffered past persecution or a well-founded fear of future persecution, his request that deportation be withheld must be denied because "the standard for withholding of deportation is even more stringent than the standard for asylum." Dobrican, 77 F.3d at 168.
 
 
 14
 PETITION FOR REVIEW DENIED AND DECISION AFFIRMED.
 
 
 
 [1]
 Magdici also testified that he attended church every Saturday until he went to high school, A.R. at 59, Tr. at 36, and that he attended church after the revolution in 1989 "when he could go." Although the IJ mistakenly stated at one point in his decision that Magdici was able to attend church twice a week before he left Romania, his first mention of the Magdici's church attendance correctly stated that Magdici had attended church approximately twice a month after 1993. A.R. at 17