**Oleg SIZOV, Elena Sizov and Sergei Sizov, Petitioners,**

v.

**John D. ASHCROFT,\* Respondent.**

**No. 02–2394.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 2003.

Decided July 2, 2003.

---

\* The petition for review identified the Immigration and Naturalization Service (INS) and John D. Ashcroft as the respondents in this case. The INS was properly named until March 1, 2003, when it ceased operations as an independent agency within the United States Department of Justice, and its functions were transferred to the Department of Homeland Security. See Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002). The Sizovs' petition for review challenges the decisions of the Executive Office for Immigration Review (encompassing the Board of Immigration Appeals and the immigration court), which remains within the Department of Justice. Attorney General John D. Ashcroft heads up the Department of Justice; therefore he is listed as the sole respondent in the caption. See *Ciorba v. Ashcroft*, 232 F.3d 539 n. 1 (7th Cir.2003).

Before Hon. JOEL M. FLAUM, Chief Judge, Hon. FRANK H. EASTERBROOK, and Hon. DIANE P. WOOD, Circuit Judges.

## ORDER

Oleg Sizov, together with his wife Elena and son Sergei, seek review of the Board of Immigration Appeals' (BIA) summary affirmance of an Immigration Judge's (IJ) denial of their petition for asylum and application for withholding of removal. The Sizovs have lived in the United States illegally since 1991. They seek to avoid removal to either Kazakhstan, Russia, or Ukraine, because of past persecution they suffered there and their fear of future persecution. Having entered the United States on passports issued by the U.S.S.R., the Sizovs believe that they are now stateless.[1] The IJ found the evidence insufficient to establish past persecution and credited State Department reports that the Sizovs do not face a risk of future persecution should they return to Russia, Kazakhstan or Ukraine; accordingly, their petition was denied. Although we have serious reservations about the Board's conclusion that the Sizovs were not the victims of past religious persecution, we nevertheless affirm the decision of the BIA for reasons more fully explained below.

Neither Oleg nor Elena had an easy time in the Former Soviet Union (FSU), because of an unfortunate coincidence of ethnic background and place of residence. Oleg was a Russian ethnic who was born and raised in Kazakhstan where his father was exiled during Stalin's reign, and Elena was the daughter of Russian nationals who was born in the former East Germany and then moved to Ukraine at age two. Oleg was mistreated in Kazakhstan for attempting to practice the Russian Orthodox religion. His first run-in with the authorities was in the fourth grade when he was discovered attending an underground Easter religious service. Later in high school Oleg was questioned by the KGB after a Bible that he lent to a friend was discovered at the friend's place of employment. In 1981, Oleg unsuccessfully tried to escape his problems by relocating to

---

1. Counsel for the INS assured this court at oral argument that the Sizovs will not be removed to a country that is unwilling to accept them; therefore their assertion of statelessness has no impact on our disposition of this appeal.

Leningrad, but there he was again subjected to ridicule and abuse, this time by his fellow ethnic Russians who taunted him for being from a Central Asian republic. In Leningrad Oleg attended a second-rate school (because his KGB record kept him out of the more prestigious Leningrad University) and worked various jobs. During this period he was forced to return to Kazakhstan four times for questioning by the KGB, all because of the Bible incident. The KGB finally left Oleg alone when he was summoned for military service in 1982. But the military proved no less hostile to members of the Russian Orthodox church, and Oleg was again singled out for attempting to practice his religion. His efforts to worship at a Leningrad Cathedral while on weekend furloughs subjected him to beatings, solitary confinement, and ultimately the loss of furlough privileges. Two years later his military service was completed, and he returned to Leningrad where he was hired to work for the local police, a position that entitled him to a coveted residence permit, or *propiska*.

The next chapter in Oleg's Leningrad experience began in 1986 when Oleg and Elena married. Finding suitable housing was challenging for the couple, and they initially lived in sex-segregated dormitories where they had limited access. Nonetheless Elena soon became pregnant, and the Sizovs were lucky enough to obtain a permit to live together in a dormitory that was slated for demolition. This arrangement did not last long, and the couple was threatened with expulsion just before Sergei's birth. Trouble was around the corner once again when Sergei's baptism came to Oleg's employer's attention. The employer threatened to fire Oleg if he did not stop practicing his religion. Oleg eventually left his job, perhaps because he quit in frustration over his co-workers' corruption, perhaps because of the baptism incident.

With the loss of Oleg's job came the loss of the residence permit to remain in Leningrad. The Sizovs spent the remainder of their time in the FSU bouncing between friends' apartments in Leningrad and Elena's parents' house in Ukraine. But Ukraine was no more welcoming of the Sizovs than Russia or Kazakhstan, and they were taunted by Ukrainian nationalists for being Russian. After several run-ins with local nationalists, Oleg, Elena and Sergei returned to Leningrad and applied for visas to visit the United States.

Elena's story is similar to Oleg's. Her family was persecuted in Ukraine because of their religious and political beliefs. This persecution kept Elena from pursuing the best educational opportunities, and eventually she fled to Leningrad after she was expelled from school because of her political activism. In Leningrad Elena had no choice but to take a low-paying construction job, which at least qualified her for a residence permit. Finally, upon her marriage to Oleg, his troubles became hers, and Elena dropped out of school after it was made clear to her that as Oleg's new wife she was no longer welcome.

The IJ heard evidence of the Sizovs' experiences in Russia, Kazakhstan and Ukraine and found it insufficient to support a claim of past religious persecution. He also considered a State Department advisory opinion on the Sizovs' petition, as well as a State Department country report that addressed the general situation in Russia, Kazakhstan and Ukraine, and was equally unpersuaded that the Sizovs had a reasonable fear of future persecution on the basis of either their religious beliefs or their national origin. The BIA agreed that there was insufficient evidence to find past or future persecution and dismissed the Sizovs' appeal.

Since the BIA's opinion in this case summarily adopted the IJ's decision, "we re-

view the IJ's analysis as if it were the Board's." *Mousa v. I.N.S.*, 223 F.3d 425, 428 (7th Cir.2000). We will uphold the IJ's conclusion that the Sizovs did not experience past persecution only if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole," *id.* (quoting *I.N.S. v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)), and will only reverse in an asylum case "if the evidence presented 'was such that a reasonable fact finder would have to conclude that the requisite fear of persecution existed.' " *Dobrican v. I.N.S.*, 77 F.3d 164, 167 (7th Cir.1996) (quoting *Elias–Zacarias*, 502 U.S. at 481, 112 S.Ct. 812).

▉ Asylum is granted at the discretion of the Attorney General to refugees who face "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); 8 U.S.C. § 1158(b)(1). It is the applicant's burden to show that the fear of persecution is both "(subjectively) genuine and that it is reasonable in light of the (objective) credible evidence." *Dobrican*, 77 F.3d at 167. If the Sizovs establish that they experienced past persecution, they benefit from a presumption of future persecution unless the future persecution is based on unrelated circumstances, 8 C.F.R. § 208.13(b)(1), or the conditions giving rise to the past persecution have changed such that a presumption of future persecution is unwarranted. *Bereza v. I.N.S.*, 115 F.3d 468, 472 (7th Cir.1997) (citing 8 C.F.R. § 208.13(b)(1)(i)). And even absent a showing of future persecution, asylum may be granted in those cases where past persecution was so severe that it is unreasonable to return the petitioner to her country of origin. *Id.*

▉ Although "persecution" is not defined by statute or regulation, we require a showing of conduct that rises above the level of mere harassment. A petitioner need not, however, establish that her life or freedom has been or will be directly threatened in order to establish past or future persecution. *Id.* As we have explained, "the difference between persecution and discrimination is one of degree," but as a generalization, members of ethnic minorities have been persecuted (as opposed to discriminated against) when they are the subject of "official and severe, or nonofficial but lethal and condoned" conduct on account of a protected characteristic. *Bucur v. I.N.S.*, 109 F.3d 399, 403 (7th Cir.1997). It is primarily the BIA's job, and not the job of this court, to police the line between discrimination and persecution. *Id.*

Notwithstanding the division of labor between this court and the BIA on the question of when discrimination rises to the level of persecution, appellate review offers an opportunity to correct the BIA when it either applies an improper legal standard or unreasonably interprets a petitioner's prior experiences. In this case, the IJ (and the BIA on appeal), found that the Sizovs did not experience past persecution on account of religion, national origin, or any other impermissible basis. The IJ's findings boil down to a laundry-list of eight reasons why the Sizovs were not the victims of past persecution, including that the KGB never physically harmed Oleg when it questioned him after the Bible incident, that he was not persecuted in the army and that he obtained a high level security position upon release from the army. With all due respect, we find this conclusion highly problematic. The record was replete with evidence of Oleg Sizov's inability freely to practice the Russian Orthodox religion. Oleg was singled out for his religious observance starting in the Fourth grade when he was publicly disciplined at school for attending clandestine Easter prayer services, and again prior to

his high school graduation when his copy of the Bible was found in a friend's possession. The military was no less receptive to Oleg's efforts to practice his religion, and he was detained, beaten and deprived of weekend furlough privileges all because of his efforts to practice his religion. The troubles continued when Oleg and Elena baptized their son Sergei. The IJ did not offer an adequate explanation of why this background added up to the conclusion that the Sizovs did not experience past religious persecution. See, *e.g., Bucur,* 109 F.3d at 405 ("it is virtually the definition of religious persecution that the votaries are forbidden to practice it").

■ Nevertheless, even if the IJ erred in finding the Sizovs did not suffer past religious persecution, they must still show that they have a well-founded fear of persecution if they are removed to Russia, Kazakhstan or Ukraine. Dramatic changes in the FSU have taken place over the last decades. (We note that the Sizovs have not attempted to secure asylum on the grounds of the severity of past discrimination. This was a wise tactical choice, because this is a narrow category of relief reserved for atrocities of the order of magnitude of the Holocaust or Cambodian genocides.) The record in this case contains both State Department country reports on Kazakhstan and Russia, a lengthy profile of asylum claims and country conditions for Russia, and an individualized letter prepared by the State Department's Bureau of Democracy, Human Rights and Labor in response to the Sizovs' petition. This evidence demonstrates that with the demise of the Communist regime came an end to state-sponsored atheism. Citizens of the FSU are in theory now free to practice the religion of their choice, and the State Department's country reports on Kazakhstan and Russia, as well as the advisory letter, suggest that adherents to the Russian Orthodox religion no longer face religious persecution.

(Both the generalized country reports and the advisory letter are somewhat dated in this record, with the reports issued in 1996 and the letter prepared in April, 1997. It is conceivable that conditions have changed in the interim, but the Sizovs have not called the continued accuracy of these reports into question on appeal.) In response to this evidence, the Sizovs have submitted little but their own testimony concerning their fears of persecution if they are removed. While the record does contain several newspaper reports (also from 1996) describing, among other things, the Russian church at a crossroads, and allegations of corruption in the resurgent church, these articles do not provide the type of particularized evidence that would compel the conclusion that the Sizovs will face religious persecution if forced back to the FSU. See *Dobrota v. I.N.S.,* 195 F.3d 970, 974 (7th Cir.1999). In short, even though the Sizovs experienced religious persecution in the past, they have not established that they face an objectively reasonable fear of future religious persecution if they are removed.

■ The other aspect of the Sizovs' asylum claim deals with discrimination that they suffered on the basis of national origin (the Sizovs were singled out in Kazakhstan and Ukraine as ethnic Russians even as they were mistreated in Russia for being from Central Asia), which the Sizovs believe amounts to economic persecution. In their brief to this court the Sizovs insist that the current residency permit system in Russia (which, they believe, will make it impossible for them to live in a region where there are jobs), "constitutes the deliberate imposition of a substantial economic disadvantage, to punish Petitioners for not being natives of Russia." While if true this allegation might suggest persecution, the State Department advisory letter in this case pointed out that this system applies to most non-residents of Russia, and therefore cannot properly be de-

scribed as targeted persecution. It more likely reflects the dire economic situation in the FSU that has caused a wave of migration from outlying republics to Russia where economic prospects seem brighter. Just as general regional strife is insufficient to support a petition for asylum, see, *e.g., Bradvica v. I.N.S.,* 128 F.3d 1009, 1013 (7th Cir.1997), so too widespread economic troubles are insufficient to support a grant of asylum.

Since the Sizovs have failed to meet the less stringent burden to support their petition for asylum, they necessarily cannot support a claim for withholding of removal either, *Bhatt v. Reno,* 172 F.3d 978, 982 (7th Cir.1999); *Dobrican,* 77 F.3d at 168. Accordingly, we affirm the denial of the Sizovs' petition for withholding of removal. The decision of the Board is supported by substantial evidence, and it is therefore AFFIRMED.